Kersh Lake Drainage District *v.* Johnson
(4-6332)
and
State Bank & Trust Company of Wellston, Missouri,
*v.* Holthoff.

4-6332 and 4-6474                              157 S. W. 2d 39

Opinion delivered December 8, 1941.

*Robert A. Zebold, Rowell, Rowell & Dickey* and *Rose, Loughborough, Dobyns & House,* for appellants.

*A. J. Johnson, Coleman & Riddick* and *E. W. Brockman,* for appellees.

McHANEY, J. A. J. Johnson owned lands in the Kersh Lake Drainage District, hereinafter referred to as the District, against which betterments amounting to $1,600 were assessed. Prior to 1931, he had paid installments of these betterments in the total sum of $1,628. Anticipating that the district would attempt to collect additional assessments against his lands, he brought suit against the district, in which he alleged that he had fully paid all the assessments of benefits which could legally be imposed upon his lands. He prayed that it be adjudged that he had discharged the lien of the district against his lands, and that the district be enjoined from thereafter attempting to collect further assessments of benefits against his lands. A decree, which will hereinafter be referred to as the Johnson decree, was rendered in October, 1931, awarding the relief prayed.

That this decree was erroneous is now conceded. It ignored act 457 of the General Acts of 1919, p. 343, conferring the power upon drainage districts to collect interest on deferred payments of installments of benefits. This power has been upheld in numerous decisions of this court: *Oliver* v. *Whittaker,* 122 Ark. 291, 183 S. W. 201; *Jones* v. *Fletcher,* 132 Ark. 328, 200 S. W. 1034; *Skillern* v. *White River Levee District,* 139 Ark. 4, 212 S. W. 90; *Pfeiffer* v. *Bertig,* 141 Ark. 531, 217 S. W. 791; *Summers* v. *Cole,* 144 Ark. 494, 223 S. W. 721; *Phillips* v. *Tyronza & St. Francis Road Imp. District,* 145 Ark. 487, 224 S. W. 981; *Chicago Mill & Lumber Co.* v. *Drainage District No. 17,* 172 Ark. 1059, 291 S. W. 910; *Benton* v. *Nowlin,* 187 Ark. 738, 62 S. W. 2d 16.

The effect of the Johnson decree was to relieve the tract of land owned by him from the payment of additional taxes for which his lands were liable under the law.

Quite naturally, other landowners similarly situated desired the same relief, and Johnson, who is an able and reputable lawyer, was employed to obtain for them the relief which he had secured for himself as an owner of lands in the district.

A suit for that purpose was filed in the names of W. A. and Clyde E. Fish, in which it was alleged that

they sued for the benefit of themselves and all other landowners similarly situated. This suit eventuated in a decree rendered June 15, 1932, which will hereinafter be referred to as the Fish decree, which awarded the relief prayed.

There was uncertainty as to what landowners had paid taxes equaling or exceeding the benefits assessed against their lands, and to avoid a multiplicity of suits, it was agreed with the commissioners of the district that an audit be made, from which this fact could be ascertained. The commissioners directed that the audit be made and the cost thereof was paid with the funds of the district. It was upon this audit that the Fish decree was rendered awarding all landowners whose lands were similarly situated to those of Johnson exemption from the payment of any tax in excess of the original betterments assessed against those lands.

As created, the district contained 29,000 acres of assessed land. The effect of the Fish decree was to exempt something like 20,000 acres of land from all liability for interest on betterments. This action operated, of course, to cast upon the remainder of the lands which had not been thus relieved the burden of discharging the district's unpaid obligations. There is a limit to this liability, the limit being the full amount of betterments assessed, with interest thereon. In no event can any land be required to pay more; but all the lands which have not been relieved can be required to pay that much. It is a matter of common knowledge that there is usually, just as there is here, a wide spread between the amount of indebtedness and the amount of the assessed benefits. Assessors of benefits are generally very liberal and optimistic in assessing the benefits. Practically speaking, this gives the appearance of a wide margin of safety to the investing public where betterments largely exceed cost and consequent indebtedness. The injustice worked by the Fish decree to landowners who were not fortunate enough to be beneficiaries of that decree is obvious, unless, indeed, all landowners are excused from the payment of interest when they have paid the amount of their assessed benefits. When and if that is done, the innocent

holders of the district's certificates of indebtedness will be left with worthless securities in their hands, and this as the result of a suit of which they were unaware and which we think was purposely concealed from them by the dominant commissioner of the district whose duty it was to protect their interests, but who chose rather to protect his own.

The district brought suit to enforce the payment of delinquent assessments for the years 1935 and 1936, to provide funds for the payment of the indebtedness of the district the validity of which no one questions. An answer was filed, which pleaded the Johnson and Fish decrees as a bar to this suit, it being alleged that the Fish decree was a class suit and that it inured to the benefit of all persons similarly situated, that is, all persons who had paid a sum equal to or in excess of the amount of their assessed benefits exclusive of interest.

The district filed an amendment to the complaint to collect the delinquent assessments in which it was alleged that the suit had been brought under the authority of and pursuant to the directions of the decree of the circuit court of appeals of this circuit in the case of *Kersh Lake Drainage District* v. *State Bank & Trust Co. of Wellston, Mo.,* 92 Fed. 2d 783.

This decree of the circuit court of appeals was pleaded as *res adjudicata* of the right of the district to collect the delinquent assessments. The landowners pleaded the Johnson and Fish decrees as *res adjudicata* of their liability for additional assessments. The chancellor who rendered the Johnson and Fish decrees had, through his death, been succeeded by another who overruled the landowners' plea and as it was admitted that the delinquent assessments had not been paid, he rendered a decree ordering the foreclosure of the delinquent assessments. That decree was reveresed on an appeal to this court. *Johnson* v. *Kersh Lake Drainage District,* 198 Ark. 743, 131 S. W. 2d 620, and this decision was affirmed on appeal to the Supreme Court of the United States. *Kersh Lake Drainage District* v. *Johnson,* 309 U. S. 485, 60 S. Ct. 640, 84 L. Ed. 881, 128 A. L. R. 386.

It was the theory and finding, both of this court and of the Supreme Court of the United States, that while the decree of the circuit court of appeals, *supra,* concluded the question of the liability to the district and its duty to levy an assessment of taxes against benefits to pay its indebtedness, this did not preclude any particular land-owner from showing that he had, in fact, paid all the assessments of benefits legally chargeable against his lands, and that the Johnson and Fish decrees were *res adjudicata* of the fact that the persons whose lands were covered by the Fish decree had paid all the taxes for which their lands were liable.

In so holding it was said in the opinion of this court, *supra,* 198 Ark. 743, 131 S. W. 2d 625, that "We hold that these decrees are *res adjudicata,* and we do not think it material in the present case whether those decrees of the state court were right or wrong, there being no allegation of fraud or want of jurisdiction," and further, that "The decrees in these suits rendered in 1931 and 1932, could only have been set aside on appeal or by direct action to annul them on the ground of fraud and as we have said no appeals were taken and no fraud on the court in which decrees were rendered is reflected by this record."

This language was quoted approvingly by the Supreme Court of the United States, and it was there said: "And so are petitioners bound by the decrees in the chancery suits, in which the commissioners, as parties, appropriately asserted the lien for the benefit of certain certificate holders, unless there was fraud or collusion." 309 U. S. 485, 60 S. Ct. 644, 84 L. Ed. 881, 128 A. L. R. 386. In other words, the Johnson and Fish decrees are *res adjudicata* of the right of the drainage district to collect any amount in excess of original betterment assessments, unless those decrees were obtained by fraud or collusion.

After the affirmance of the decision of this court, the attorneys for the State Bank & Trust Co. of Wellston, Mo., hereinafter referred to as the Bank, which is the principal creditor of the drainage district, applied to the federal district court for permission to institute suit. It

was then in this federal district court that the litigation originated which determined the validity of the certificates of indebtedness owned by the bank, and also the duty of the district to levy taxes to pay the indebtedness. *Kersh Lake Drainage District* v. *State Bank & Trust Co.*, 85 Fed. 2d 643.

Permission was asked to file supplemental pleadings raising three points: (a) The question as to whether the Fish decree had been obtained by fraud; (b) the question as to whether that decree did not, by its terms, bar some of the lands from the claim of *res adjudicata;* and (c) the question as to whether some of the descriptions in the Fish decree were void for uncertainty.

The commissioners, as such, acquiesced in the filing of those supplemental pleadings, but the commissioners, as individual landowners, objected to the filing of the supplemental pleadings and especially that part which raised the question of fraud in the rendition of the Fish decree. The district court considered it improper to require the commissioners to litigate the question of their own fraud, and required them to litigate only points (b) and (c). The right of the creditor bank to proceed as it was advised was not denied.

Pursuant to that order the bank, in the name of the district, filed an amendment to the complaint in the foreclosure suit and set forth the grounds of complaint to which it was limited by the order of the district court. A decree was rendered July 11, 1940, overruling the complaint and the bank, in the name of the district, perfected an appeal to this court.

This feature of the case will be first disposed of by saying that if the plea of *res adjudicata* is not now sustained, those lands will be liable for unpaid taxes due on them, and it will be unnecessary to consider whether those lands are excluded from the benefits of the Fish decree through improper descriptions or for other reasons, and we do not consider the liability of those lands as distinguished from those properly described in the Fish decree.

The bank, in its own name, alleged and offered much testimony to show that the Fish decree had been obtained by fraud and also that it was rendered through an unavoidable casualty. The district pleaded the Fish decree and the decrees of this court and that of the Supreme Court of the United States, *supra*, as *res adjudicata* and conclusive of the question. The plea was sustained and, from that part of the decree, the bank has appealed.

Now, the Johnson suit was not a class. suit and it may be dismissed from consideration in the question of fraud, except in so far as it explains the nature and effect of the Fish decree which decree was rendered in a class suit.

Suits of this character are bought against the commissioners as such, and it is only in this manner that the district may be sued. The commissioners, as such, defend the district, which is to say for all landowners in the district and such suits bind all landowners in the district. It is not required that the individual landowners be sued, and they are as completely bound as if they had appeared and defended. The law was so decided by the Supreme Court of the United States in affirming the decision of this court. This is a rule of universal application, but its application assumes that such a decree was not collusive and that the decree was not obtained through fraud practiced upon the court. The decisions both of this court and of the Supreme Court of the United States, *supra*, recognize this exception.

Section 8246, Pope's Digest, provides that: "The court in which a judgment or final order has been rendered or made shall have power, after the expiration of the term, to vacate or modify such judgment or order: . . . Fourth. For fraud practiced by the successful party in the obtaining of the judgment or order. . , . Seventh. For unavoidable casualty or misfortune preventing the party from appearing or defending."

It will hereinafter be shown indubitably that the principal beneficiary of the Fish decree concealed from the bank the fact that this decree would be or had been rendered until the time had expired within which an appeal could be prosecuted from it.

When the existence of the decree was discovered, the right of the bank to appeal was denied, it being contended that the bank was not a creditor, for the reason that the district's certificates of indebtedness held by the bank were invalid, and it became necessary to conduct protracted litigation in the federal court which terminated in its decision by the circuit court of appeals of this circuit establishing the validity of the bank's debt against the district. *Kersh Lake Drainage District* v. *State Bank & Trust Co.*, 85 Fed. 2d 643. It then became necessary to litigate the question of the duty of the district to levy a tax to discharge that debt, and this question was litigated to a decision by the circuit court of appeals of this circuit rendered November 23, 1937, declaring that the district was under that duty. *Kersh Lake Drainage District* v. *State Bank & Trust Co. of Wellston, Mo.*, 92 Fed. 2d 783.

Upon the authority of the case last cited, suit was brought, which resulted in the rendition of a decree foreclosing the lien of the district for the proportionate part of the assessment of benefits which had been levied and extended upon the tax books returned delinquent, and it was this decree which was reversed by this court, which decision of this court was affirmed by the Supreme Court of the United States, as has been said.

The defense interposed in that suit, which this court sustained, was that the Fish decree was *res adjudicata*. The purpose of the present suit is to show that the decree was obtained through fraud and unavoidable casualty, and is permitted to be done on the authority of the statute above quoted.

Was the decree obtained through fraud practiced upon the court or as a result of unavoidable casualty?

As a result of the decision of this court in the case of *Hopson* v. *Hellums*, 108 Ark. 460, 158 S. W. 771, and a second appeal in a second case under the same style in 111 Ark. 421, 163 S. W. 1191, the drainage district did not issue bonds, but did issue certificates of indebtedness bearing interest as they were by law permitted to do. Ordinarily, such districts issue bonds and designate a trustee. This the district did not do. On the contrary,

it issued certificates of indebtedness bearing interest at the rate of 6 per cent. per annum. These certificates were negotiable and passed into the hands of many persons, and a number of them were acquired by the bank for some of which it paid a premium in excess of the face value of the certificates.

This section of the country was in the trough of the depression in the years 1931 and 1932, and the great majority of these improvement districts made default in the payment both of principal and interest. This is a matter of common knowledge. This district, unlike most others, continued to pay its interest, and it was neither altruism nor generosity that restrained its creditors from demanding payment of said certificates at maturity. They were more fortunate than most creditors of similar districts in being paid interest.

Now, while the district did not issue bonds and did not have a trustee, it did designate the First National Bank, of St. Louis, Mo., as its paying agent to pay its interest and sufficient funds were remitted to this agent for that purpose. The semi-annual installment of interest due August 1, 1932, was paid. At that time the creditors of the district were in profound ignorance of the fact that anything had occurred which impaired their security. On August 4, 1932, the district remitted to its paying agent the sum of $4,215.51, to be disbursed in payment of interest due August 1st of that year.

The next semi-annual interest payment fell due February 1, 1933. The bank not receiving the initerest then due on the certificates held by it wrote the secretary of the district a letter inquiring when the interest would be paid. This letter was returned with the notation on it that the interest would be paid sometime in March, 1933. At that time had the creditors of the district been apprised of the Fish decree, time remained for an appeal to be prosecuted. But that decree had been prepared without containing the usual prayer for an appeal to the supreme court.

It is obvious that the proceedings eventuating in the Fish decree had been in the incubator for some time.

The Johnson decree was rendered October 31, 1931. The audit for which the commissioners of the district paid with district funds was ready by June 8, 1932. This audit showed the lands similarly situated to the lands of Johnson. As soon as the audit was ready the Fish suit was filed—this on June 8, 1932. No summons was issued on the complaint. On the day after the complaint was filed, the defendant district filed an answer which tacitly admitted that the commissioners had, prior to the filing of the complaint, consented that all lands upon which the original assessments had been paid would be released from further tax liability. On June 15, 1932, the decree was entered. By its terms the district was restrained from assessing, levying, or in any manner encumbering, the lands described in the audit, except certain lands listed in a column entitled "Balance to be levied," and the position is now taken by the commissioners that the lands listed in that column are, by the terms of the original decree, exempt from further liability after the original assessments of benefits against them have been paid.

The creditor bank makes the showing that its officials were unaware of the Fish decree until after the time had expired for an appeal, and the testimony to that effect is practically undisputed.

By far the largest landowner in the district, and the principal beneficiary of the Fish decree, and who appears to have dominated the affairs of the district, was C. H. Holthoff, who became a commissioner in 1924 and was the secretary of the district when the letters above referred to were written. Holthoff testified that while he was the secretary of the district he had a Mr. Gill to do the work. The decree relieves Holthoff's lands from assessments totaling more than $20,000. Holthoff testified that he desired to know the names of the creditors of the district, and for that purpose called at the Third National Bank in St. Louis without obtaining the information. Why he called on this bank instead of the bank acting as paying agent is not made clear. When asked what conversation he had with any official of the Third National relating to the suit, he said: "We didn't discuss the suits, you

know. The bank seemed to already have the information."

We think it is established indubitably that the creditors were unaware of either the original Johnson decree or the Fish decree until after the time had expired during which an appeal could be prosecuted; and we think it equally certain—and we find the fact to be—that Holthoff intended that it should be so. If this fact were otherwise in doubt the following correspondence removes the doubt.

On February 10, 1933, the president of the bank wrote the secretary of the district a letter asking when the interest would be paid, and on the bottom of this letter, which was returned to the writer, appeared the notation: "No funds. 3-15. Sometime in March, 1933."

Another letter, similarly directed, dated March 22, 1933, repeated the inquiry. On this letter as returned to the writer was the notation: "Interest will not be paid this month, but will try to pay in the near future."

Again, on April 17, 1933, the inquiry was repeated, and this notation appears on the letter: "Everybody taking advantage of extension of tax-paying time. May be June."

This correspondence was conducted by Gill, but he testified that "Whenever one of those communications would come in I would consult Mr. Holthoff, in order to give the right answer."

The answer to the letter last referred to was calculated—and we think was intended—to leave the impression that payments had not been made because of failure of landowners to pay their taxes, but that payments would be resumed when taxes were collected.

The time was near when the right of appeal would be lost, and there was no intimation that a decree had been rendered which would make it impossible for the district to redeem the promise that payment would be made "Maybe June."

Later, when the time for an appeal had expired, Holthoff himself, as secretary of the district, wrote the

bank the following letter: "All lands in this district which are of any value have already paid their full assessed benefits, and there will not be any money to pay either bonds or interest. However, we have made arrangements with the Simmons National Bank of Pine Bluff to take up a limited amount of these bonds at 20 cents on the dollar. (Signed) C. H. Holthoff, Secretary."

The information contained in this letter was not information which had been recently acquired. As soon as the bank received the letter, its representative came to this state and discovered the decrees which are pleaded in bar of their certificates, and since that time the bank has proceeded with the utmost diligence to protect its interests so that in no event can it be said that the bank is barred by laches. Thereafter followed the litigation herein detailed.

Now, the law is that to vacate a judgment subsequent to the term in which it was rendered it must be shown that fraud was practiced upon the court in the procurement of the judgment or that an unavoidable casualty or misfortune was suffered which prevented the party from appearing or defending. This is conceded to be the law in the briefs of opposing counsel.

There was fraud in the rendition of the Fish decree, actual fraud on the part of Holthoff, the principal beneficiary of that decree and the dominating director of the district. In the preparation of the audit, for which he paid with district funds, he was not representing the interests of the district, but his own interests. But if it be said that actual fraud was not proved, then, certainly, there was constructive fraud.

In the chapter on Fraud and Deceit in 23 Am. Jur., § 4, p. 756, it is said: "The broadest classification of fraud is actual or constructive. To constitute positive or actual fraud, there must be such fraud as affects the conscience; that is, there must be an intentional deception. In other words, active and positive fraud includes cases of the intentional and successful employment of any cunning, deception, or artifice to circumvent, cheat, or deceive another. Constructive fraud, sometimes called

legal fraud, is nevertheless fraud, although it rests upon presumption and rests less upon furtive intent than does moral fraud. It is presumed from the relation of the parties to a transaction or from the circumstances under which it takes place. The conscience is not necessarily affected by it. Indeed, it has been said that it generally involves a mere mistake of fact. Hence, the terms 'constructive fraud' and 'legal fraud' both connote in certain circumstances, one may be charged with the consequences of his words and acts, as though he had spoken or acted fraudulently, although, properly speaking, his conduct does not merit this opprobrium.'' .

Holthoff admits that Johnson was representing him personally in obtaining the Fish decree and that he owed Johnson a reasonable fee for services, the amount of which has not been agreed upon, but which will no doubt be augmented by services rendered since that decree in the effort to sustain it.

We, therefore, conclude that at least a legal fraud, if not actual, was practiced in obtaining the decree in the Fish case, and that the district's creditors were misled and deceived to such an extent that they suffered an unavoidable casualty within the meaning of § 8246 of Pope's Digest, quoted above, and that they may now maintain this action to vacate, annul and set aside said decree, and that same should be vacated, annulled, set aside and held for naught to the end that all the lands covered by said decree may be required to bear their just proportion of said indebtedness within the limits of the betterments assessed against them, including interest on the deferred installments of assessed benefits, as provided by statute.

The decree will be reversed, and the cause remanded with directions to vacate, annual and set aside said Fish decree, and for further proceeding according to law, the principles of equity and not inconsistent with this opinoin.

Holt, J., dissenting. I cannot agree with the majority opinion. It is my view that the questions and issues presented on these two appeals were finally determined

and adjudicated in the opinion of this court in *Johnson, et al.,* v. *Kersh Lake Drainage District,* 198 Ark. 743, 131 S. W. 2d 620, 132 S. W. 2d 658, and later affirmed by the Supreme Court of the United States in *Kersh Lake Drainage District* v. *Johnson,* 309 U. S. 485, 60 Sup. Ct. 640, 84 L. Ed. 881, 128 A. L. R. 386. The defense set up by Johnson in that case, for himself and all other landowners in the district similarly situated, was one of *res judicata.* The doctrine of *res judicata* clearly applies on these appeals.

Appellant creditors and bondholders of the district in case No. 6474 attempt here, after waiting more than nine years, to set aside the Fish decree rendered in 1932 on the ground of fraud on the part of the commissioners.

In case No. 6332 appellants attempt to set aside this same decree after a lapse of nine years on the grounds "(b) that many of the descriptions in the suit of *Fish* v. *Drainage District* were void from uncertainty and (c) that by the express terms of that decree certain lands were excluded from its benefits."

All of these alleged defenses were available to appellants at the time the cases were tried below. Appellants having failed to appeal from the Johnson decree in 1931 and from the Fish decree in 1932 concede that any rights that they might have had to question these decrees were lost and were terminated by their failure to appeal within apt time, unless they can show fraud in the procurement of these decrees. Appellants admit that the decree in favor of Johnson against the district in 1931 is binding upon the district and bondholders and is without fraud in its procurement. They question only the Fish decree. Although Johnson sued for himself alone as a property holder in the district, and Fish, less than a year after the Johnson decree, sued the commissioners of the district for himself and all other property owners similarly situated, I am unable to see how there can possibly be fraud in the Fish case and none in the Johnson case. The sole purpose of the Johnson suit was to establish that he had paid all assessments of benefits against his 160-acre tract over a 20-year period and therefore that he owed the

district nothing. The purpose of the Fish suit was to ascertain what landowners had paid all assessed benefits, who had overpaid, and who had failed to pay the assessments due. The purpose of the Fish suit was an attempt of the landowners in the district to establish their legal rights on the assessment of benefits in accordance with the decree of the court in the Johnson case.

The contention of appellants that they were not parties to either the Johnson suit in 1931 or the Fish suit of 1932, and knew nothing of these proceedings, is without merit. The Supreme Court of the United States in its opinion in *Kersh Lake Drainage District* v. *Johnson,* 309 U. S. 485, 60 S. Ct. 640, 84 L. Ed. 881, 128 A. L. R. 386, held squarely against this contention of appellants, using this language: "These certificate holders were not entitled to be made parties in the Lincoln chancery proceedings just as in practice creditors of a corporation are not, unless otherwise provided by statute, made parties in a suit between a stockholder and the corporation to determine liability on a stock subscription, between the corporation and a third person to recover corporate assets, or in a suit brought against the corporation by creditors, stockholders or officers. It has been held that bondholders are not necessary parties to and are bound by the decree—even if adverse to their interests—in litigation wherein an indenture trustee under a bond issue is a party and exercises in good faith and without neglect his contractual authority to represent and assert the lien securing the issue. And so are these petitioners bound by the decrees in the chancery suit in which the commissioners as parties appropriately asserted the lien for benefit of certificate holders—unless there was fraud or collusion."

Appellants in substance and in fact were really the only parties upon one side of the issues. The textwriter in 15 R. C. L. 1010, § 483, says:

"The courts look beyond the nominal parties, and treat all those whose interests are involved in the litigation and who conduct and control the action or defense as real parties, and hold them concluded by any judg-

ment which may be rendered, as, for example, those who employ counsel in the case, assume the active management of the proceeding or defense, or who pay the costs and do such other things as are generally done by parties.

. . .

"Similarly, where a suit is prosecuted or defended by one person at the instance of another, and for the latter's benefit, the judgment will be binding and concluisve upon the latter. In all such cases the strict rule that a judgment operates as *res judicata* only in regard to parties and privies expands to include such persons as parties, or at least as privies."

Unless appellants have established fraud practiced on the court in the procurement of the Fish decree, it must stand and is binding on them. I am clearly of the view that neither fraud nor what could amount to constructive fraud appears in the record before us. The undisputed facts show that this drainage district was in default, at least on the principal of its bonds, as early as 1929. The creditors knew this. The Supreme Court of the United States has said that the creditors were parties to the Johnson and Fish suits, and in effect, knew everything that was taking place. Any defenses that they had to those suits, which they interposed, or could have interposed, were barred by their failure to appeal from those decrees within the statutory period of six months. § 6274, Pope's Digest. Any alleged fraudulent conduct of the commissioners was as well known to the appellants (creditors of the district) when these chancery suits were tried in 1931 and 1932 as later.

Appellants say that the fact that the commissioners of the district were large landowners therein, and would necessarily benefit by the Johnson and Fish decrees, and that this, if not evidence of actual fraud, was constructive fraud. The law governing the creation of this and all other similar districts, requires that each commissioner own land within the district before he can qualify as a commissioner. This is a prerequisite to qualification. Of course, any suit against the commissioners who represent the creditors would directly or indirectly result in

a benefit or injury to the commissioners. How fraud on the court can be imputed to them in such circumstances, I am unable to see. There is no evidence in this record that the court was ignorant of the fact that the commissioners would be benefitted by the Fish decree or that the commissioners concealed from the court any material facts leading up to the Fish decree. The evidence clearly shows that the trial court knew how the Fish suit originated, why it was brought and what was expected to be accomplished by it. There is nothing in the record to show that the commissioners did not make a full defense or that any fraud was practiced upon the court. The most that can be said about the Johnson decree and the Fish decree is that the court made a mistake as to the law.

The rule is that fraud of the kind to authorize the setting aside of a judgment must be fraud extrinsic of the matter tried in the cause and a fraud practiced upon the court in procuring a judgment and not a fraud practiced upon the parties to the litigation. In *Dent* v. *Adkisson*, 191 Ark. 901, 88 S. W. 2d 826, this court, referring to Crawford & Moses' Digest, § 6290, subdivision 4 (now Pope's Digest, § 8246, subdivision 4), said: "This subdivision provides: 'For fraud practiced by the successful party in the obtaining of the judgment or order,' such judgment or order may be vacated. We have always held that the fraud referred to in this subdivision was fraud practiced upon the court in the procurement of the judgment or order and not upon the party or parties to the litigation. See *Holland* v. *Wait,* 191 Ark. 405, 86 S. W. 2d 415, and cases there cited."

Certainly a judgment cannot be impeached for fraud by showing that the judge had all the facts before him but decided the case wrong.

In *Pattison* v. *Smith,* 94 Ark. 588, 127 S. W. 983, this court said: " 'But the fraud which entitled a party to impeach a judgment must be a fraud extrinsic of the matter tried in the cause. It must not consist of any false or fraudulent act or testimony the truth of which was or might have been in issue in the proceeding before the court which resulted in the judgment that is thus assailed.

It must be a fraud practiced upon the court in the procurement of the judgment.' *Bank of Pine Bluff* v. *Levi*, 90 Ark. 166, 118 S. W. 250.''

And in *Estes* v. *Lucky*, 133 Ark. 97, 201 S. W. 815, this court said: ''It is said that the judgment was fraudulent because the order made by the probate court for the administrator to borrow the money with which to pay the lien indebtedness against the land was void. It is not shown that this fact was suppressed or withheld from the court rendering the original judgment. It was a matter that was or might have been presented in the original suit and is now excluded from consideration under the doctrine of *res adjudicata.*''

In *Cabell* v. *Board of Improvement*, 124 Ark. 278, 187 S. W. 666, we quote from the opinion as follows: ''It is contended by counsel for appellants that the decree was procured by fraud because the complaint in the statutory proceeding to collect the delinquent assessments alleged that the owners of the lots in controversy were unknown when it was well known to the commissioners that appellants were the owners of the lots. This contention was settled adversely to appellants in the case of *Cassady* v. *Norris*, 118 Ark. 449, 177 S. W. 10. There Cassady, who was a non-resident of the state of Arkansas, owned property in Mena, Arkansas. . . . .

'' 'But these allegations were not sufficient to constitute a fraud practiced by the successful party in obtaining the judgment. The allegation in the complaint, in the suit to condemn, that the owner was unknown was sufficient to give the court jurisdiction to proceed against the property. It was not a fraud on the court to make this allegation, although it was untrue; for the court had the power to inquire into its jurisdiction and to determine whether or not it was true. The recitals of the decree condemning the lot in controversy to be sold were, in effect, that the owners of the lots were designated as unknown, and that they were unknown to the board of improvement. We must presume, in the face of these allegations, that the court did make inquiry as to its jurisdiction to proceed against the property, and found that

it had jurisdiction. In other words, that the complaint alleged that the owners of the lots were unknown, and that such was the fact.'

"(1) The court held that, since a decree of sale of real estate for nonpayment of taxes may be impeached for fraud only where such fraud is extrinsic of the matter tried in the cause, such decree may not be set aside because the owner of the lot was proceeded against as an unknown owner, when in fact he was known to the plaintiff."

Litigation must sometime be brought to an end. As indicated, it seems to me that every issue raised on these appeals has been finally determined and that appellants should not be allowed again to litigate the same questions, although some defense might have been interposed in the Johnson and the Fish cases which might have changed the result.

The meaning and application of *res judicata* was clearly announced by this court in *Howard-Sevier Rd. Imp. Dist. No. 1 v. Hunt*, 166 Ark. 62, 265 S. W. 517, in this language:

"The rationale of the doctrine of *res judicata* is well expressed by Judge MITCHELL, in *State of Wisconsin v. Torinus*, 28 Minn. 175, 9 N. W. 725. 'The doctrine of *res judicata*,' says he, 'is founded upon two maxims of law, one of which is that "a man should not be twice vexed for the same cause," the other that "it is for the public good that there be an end of litigation"; and it is undoubtedly true that, if there be any one principle of law settled, it is that, whenever a cause of action, in the language of the law, "transit in *rem adjudicatum*," and the judgment thereupon remains in full force and unreversed, the original cause of action is merged and gone forever. After judgment on the merits, a party cannot afterwards litigate the same question in another action, although some argument might have been urged on the first trial that would have led to a different result. Such a judgment is final and conclusive, not only as to matters actually decided, but as to every other matter which the parties might have litigated and had decided as incident

to and essentially connected with the subject-matter of the litigation, as the facts then existed. The discovery of new evidence, not in the power of the party at the former trial, forms no exception to the rule. The doctrine is so just, and so necessary to the peace and good order of society, that we have no desire to either modify it or unreasonably limit its application.' "

And in the recent case of *McCarroll* v. *Farrar*, 199 Ark. 320, 134 S. W. 2d 561, we said: "The doctrine of *res judicata* is not only to protect the individual, but it is a matter of public policy."

It is my view that the majority opinion is wrong, is not sustained by the record, and that the decrees should in all things be affirmed.

I am authorized to say that Mr. Justice HUMPHREYS and Mr. Justice GREENHAW concur in this dissenting opinion.