STATE, EX REL. ATTORNEY GENERAL, *v.* KARSTON.

4-7619                                         187 S. W. 2d 327

Opinion delivered May 7, 1945.

704

*Guy E. Williams*, Attorney General, *Cleveland Holland* and *Elmo Taylor*, Assistant Attorneys General, for appellant.

*Jay M. Rowland*, for appellee.

McFADDIN, J. This is an appeal by the State from the refusal of the chancery court to entertain jurisdiction of an injunction proceeding instituted by the Attorney General. On June 28, 1944, the State of Arkansas, on the relation of Guy E. Williams, Attorney General, filed in the Garland chancery court a petition for injunction against appellee, Karston. The petition, omitting only caption and signature, reads as follows:

"Comes the State of Arkansas on the relation of Guy E. Williams, the duly elected, qualified and acting Attorney General, and shows to the court:

"1. That the defendant, A. J. Karston, in violation of the criminal laws of the State of Arkansas, now is and has been for many months heretofore the owner of, and conducting, operating and maintaining at 310 Central Avenue in Hot Springs, Arkansas, a gambling house known as 'White Front Club' wherein and whereat a turf exchange or pool room is maintained and operated where money is received, bet, won and lost on horse races and where tickets for pools on horse races to be held and run in this state and elsewhere are bought, sold and cashed; and where large numbers of persons congregate daily for the purpose of buying, selling or cashing pools on horse races and for betting on horse races, which said place is a gambling house and is commonly known and referred to as a 'bookmaking place' and that the conducting, operating and maintaining of said gambling house or bookmak-

ing place, as above described, is a violation of the criminal laws of the State of Arkansas and constitutes and is a public nuisance at common law.

"2. The said gambling house or bookmaking place conducted by the said A. J. Karston at 310 Central Avenue, Hot Springs, Arkansas, has been raided and the said A. J. Karston has been arrested therefor by the State Police on numerous occasions as follows: January 17, 1943; January 24, 1943; January 30, 1943; October 18, 1943; October 22, 1943; October 22, 1943; October 27, 1943; December 19, 1943; February 7, 1944; May 5, 1944.

"3. That a large number of other similar gambling houses or bookmaking places operated by other persons in Hot Springs have also been raided and the operators thereof arrested many times by the State Police, but that the said A. J. Karston, the defendant herein, and also the operators of said other gambling houses or bookmaking places continue to carry on their unlawful practice, as herein above set out, without restraint or molestation on the part of the local law enforcing officers charged with the duty of enforcing the law against such illegal practice and of prosecuting those who violate the law.

"That such violations of the law will be permitted to continue without being prosecuted by the local enforcement officers, and that the State of Arkansas, on the relation of Attorney General, alleges that by reason of the failure and refusal of said local officers to prosecute said operators of said bookmaking places, said open and flagrant violations of the law go on undisturbed, and that by reason thereof the ordinary and usual criminal processes are inadequate and the State of Arkansas has no adequate remedy at law to afford relief; and that the State of Arkansas is entitled to have an injunction against said persons, enjoining and restraining them from further operation of said bookmaking establishments,

"Wherefore, the petitioner prays that the defendant be restrained and enjoined from conducting and operating and maintaining said bookmaking establishment, conducted by him as herein alleged, and for all other equitable relief."

The defendant filed his general and special demurrer to the petition; and on November 29, 1944, the chancery court sustained the demurrer: "upon the ground that the chancery court has no jurisdiction of the matters involved, and that the Attorney General is without authority to present said action." Thereupon the plaintiff, refusing to plead further, the petition was dismissed; and this appeal follows:

I. *The Effect of the Demurrer.* Preliminary to a discussion of the two grounds assigned by the chancery court as reasons for dismissing the petition, it is fitting that we make a few observations:

The demurrer by the defendant admitted, for the purpose of a ruling thereon, all the allegations of the petition that were well pleaded. See cases collected in West's Arkansas Digest, "Pleadings," § 214. So, we have here a case where it is admitted by demurrer that Karston is operating a gambling house; that his place has been frequently raided by the State Police over a period of a year; that he continues to carry on his unlawful business "without restraint or molestation of the local law enforcing officers"; that there is a "failure and refusal by said local officers to prosecute"; that "the ordinary and usual criminal processes are inadequate"; and that, by reason of these matters, the State, on the relation of the Attorney General, claims it is entitled to the aid of a court of equity to enjoin the further operation of the gambling place. The case of *Albright* v. *Karston,* 206 Ark. 307, 176 S. W. 2d 421, concerned the gambling house operated by Karston, and we said: "A gambling house was a public nuisance at common law, and the operation of a gambling house has by statute been made a felony in Arkansas."

That case is judicial recognition that appellee is maintaining a public nuisance at common law. Many cases declare a gambling house to be a public nuisance at common law. See *Fox* v. *Harrison,* 178 Ark. 1189, 13 S. W. 2d 808, and *Blumensteil* v. *State,* 148 Ark. 421, 230 S. W. 262, where some of them are listed. The Attorney General alleges that the local law enforcement has

broken down, and that nothing is being done to abate this public nuisance. These facts stand as admitted by the demurrer. With this background, we approach the case.

II. *Authority of the Attorney General to Bring the Suit.* The chancery court held that the Attorney General was without authority to bring this suit. The office of Attorney General of Arkansas is created by the Constitution. (See Art. VI, §§ 1, 3, 4, and 22.) We, therefore, look to the Constitution to see the authority of the Attorney General, and Art. VI, § 22, says: "The . . . Attorney General shall perform such duties as may be prescribed by law, . . ."

The Constitution thus gave the Legislature the right to state the powers and duties of the Attorney General; and § 5582 of Pope's Digest (§ 5 of Act 131 of 1911) says:

"Nothing in this act shall relieve the Attorney General of discharging any and all duties now required of him under the common law, or by any of the statutes of this state, . . ."

From this section it is clear that the Legislature has placed on the Attorney General certain statutory duties, and also *"all duties now required of him under the common law."* The common law was adopted in this State by § 1679 of Pope's Digest. For a full discussion of the common law, see Articles in 12 C. J. 175, 15 C. J. S. 610, and 11 Am. Juris. 153. The general rule in other states as to the powers and duties of the Attorney General is in accord with the views herein expressed. In 7 C. J. S. 1222 there is this statement:

"The office of Attorney General has existed from an early period, both in England and in this country, and is vested by the common law with a great variety of duties in the administration of the government. The duties are so numerous and varied that it has not been the policy of the legislatures of the states of this country to attempt specifically to enumerate them; and where the question has come up for consideration, it is generally held that the office is clothed, in addition to the duties expressly

defined by statute, with all the power pertaining thereto under the common law.''

In 5 Am. Juris. 234, in discussing the powers and duties of the Attorney General at common law, the rule is stated:

''AT COMMON LAW.—The common-law duties of the Attorney General, as chief law officer of the state, when not restricted or limited by statute, are very numerous and varied. In England, the Attorney General was the chief legal adviser of the Crown and was intrusted with the management of all legal affairs and the prosecution of all suits, civil and criminal, in which the Crown was interested. He exercised the right of enforcing public charities, possessed supervisory powers over the estates of lunatics, and could institute equitable proceedings for the abatement of public nuisances which affected or endangered the public safety or convenience and required immediate judicial interposition. Such being the nature of the rights and duties that attached to the position at its inception, it is generally held that in the exercise of his common-law powers, an Attorney General may not only control and manage all litigation in behalf of the state, but he may also intervene in all suits or proceedings which are of concern to the general public.''

We emphasize the fact that at common law the Attorney General could ''institute equitable proceedings for the abatement of public nuisances which affected or endangered the public safety or convenience and required immediate judicial interposition.'' In 5 Am. Juris. 244, in discussing the power of the Attorney General to bring an action to restrain a public nuisance, the rule is stated:

''It is the unquestioned right of the Attorney General to file an information in equity for the abatement of nuisances which affect or endanger the public safety or convenience, and require immediate judicial interposition. Thus, he may institute proceedings to restrain acts which are injurious to public health, safety, or morals, and may prevent any invasion upon the rights of the public in highways, parks, and other public lands, and in navigable

waters. It is the general rule that the fact that the acts constituting the nuisance are punishable under the criminal law does not affect the right of the Attorney General to institute equitable proceedings to enjoin the nuisance, when for any reason such procedure is found to be more convenient and appropriate.''

*Respass* v. *Commonwealth, ex rel. Attorney General,* 131 Ky. 807, 115 S. W. 1131, 21 L. R. A., N. S., 836, is a leading case. There, the Attorney General of Kentucky filed a bill in chancery to enjoin the operation of a pool hall as a public nuisance. The Kentucky Court of Appeals held that the Attorney General had the authority to institute the suit, saying:

''The office of Attorney General comes to us with the common law. The Attorney General, at common law, as the chief law officer of the state, was allowed to institute proceedings of this sort where the interest of the state demanded it. There are numerous cases in England and in this country where the authority of the Attorney General to maintain such an action has been upheld; and it must be presumed that, when the office was created in Kentucky, it was contemplated that the officer should have all the powers then recognized as belonging to it, except so far as these powers were limited by statute. It cannot be presumed that, in creating the state government, and in creating the law department, it was contemplated that the head of the law department should not have such authority as was exercised by the Attorney General at common law.''

Another and well-considered case is *State* v. *Young,* 54 Mont. 401, 170 Pac. 947, where the Supreme Court of Montana, after reviewing the common law, and authorities generally, held that the Attorney General had authority to file an injunction to abate a brothel.

Without reviewing all of the authorities on this point, we reach the conclusion that the Attorney General of Arkansas has the power and duty to file such proceedings as here attempted; and the chancery court was in error in its holding on this point.

III. *The Jurisdiction of the Chancery Court.* The chancery court held that it had no jurisdiction in this case. We have repeatedly recognized that equity has authority to abate a public nuisance. In *Ross et al.* v. *State,* 184 Ark. 385, 42 S. W. 2d 376, we quoted from *Marvel* v. *State,* 127 Ark. 595, 193 S. W. 259, 5 A. L. R. 1458, as follows:

" 'The Legislature has not conferred the jurisdiction upon the chancery court to abate public nuisances. This jurisdiction they have always had.' "

And in the same case (*Ross et al.* v. *State, supra*) we quoted from *State* v. *Vaughan,* 81 Ark. 117, 98 S. W. 685, 7 L. R. A., N. S. 899, as follows:

" 'Injunction will not lie at the instance of the State to restrain an indictable public nuisance, unless the nuisance is one touching civil property rights or privileges of the public, or the public health is affected thereby, or some other ground of equity jurisdiction exists calling for the injunction.' "

The question, then, is, does the complaint here allege "some other ground of equity jurisdiction, calling for the injunction?"

This involves the often-discussed power of equity to enjoin a nuisance that is also punishable by the criminal law. We examine first the general rule and then our own cases. In 39 Am. Juris. 410, in discussing the propriety of a suit in equity to enjoin a public nuisance that is also a crime, the rule from the majority of American jurisdictions is stated:

"While, as a rule, courts of equity cannot enjoin the commission of a crime, the mere fact that the act constituting a nuisance is also a crime does not deprive a court of equity of jurisdiction to abate the nuisance, . . . There is a manifest distinction between enjoining an individual from committing a crime and enjoining him from using his property so as to make it a nuisance to others, and between a proceeding to abate a nuisance and one to punish the offender for the crime of maintaining

it. . . . Where the act is both a public nuisance and a crime, the state may suppress it by a suit in equity, or resort to a criminal prosecution, or may do both. . . . To warrant an injunction where the nuisance is also a crime, there must be proof of what that law denominates a nuisance as distinguished from a mere crime.''

Cases and annotations from many states are cited to sustain the statement. As a matter of historical interest, —and going to show that from the earliest times equity took jurisdiction to grant injunction when there was a breakdown in the common law courts—attention is directed to the note found in 35 American State Reports 670:

''In early times the English court of chancery, not without much protest on the part of the common-law courts, occasionally issued injunctions to restrain the commission of certain criminal acts. This jurisdiction seems to have been confined to cases in which other tribunals were too weak to protect the poorer and more helpless classes of the community against the power of the great nobles. The ground upon which the interference of the chancellor was invoked in the petition was that, by means of some lawless combinations, or by the influence which wealth and rank were able to exert, the parties against whom relief was sought were in a position to pervert the administration of justice in the common-law courts: Pomeroy's Equity Jurisprudence, 1; Spence Eq. Jurispr., c. 4, *Moses* v. *Mayor, etc., of Mobile,* 52 Ala. 198; *Stuart* v. *Board of Supervisors,* 83 Ill. 341, 25 Am. Rep. 397. The reasons for exercising this rather anomalous jurisdiction disappeared when the common-law courts became fully capable of controlling and repressing such acts of violence and outrage. . . .''

Here, we are concerned with injunction to prevent continued use of property as a nuisance, rather than with injunction to prevent continuance of a criminal act; but the quotation is given for its historical significance, and to show that equity may act when there is a breakdown of common-law processes. The fact that the right has been seldom invoked does not negative its existence. Particular

attention is called to the Annotations in 40 A. L. R. 1159, and 91 A. L. R. 320 on the jurisdiction of equity to enjoin an act amounting to a crime. We sum up: by the weight of authority, equity may act to suppress a public nuisance, even though the maintenance of the nuisance is a crime, where there is alleged in addition to the public nuisance, some facts which show the remedy at law, by prosecution of the criminal, is inadequate and incomplete to effect relief.

Such is the general rule. Let us now examine our own cases to see if they are contrary to this rule:

(1)  In *DeQueen* v. *Fenton,* 98 Ark. 521, 136 S. W. 945, the appellant city brought suit in equity to enjoin appellee from allowing his stock to run at large in the city in violation of the municipal ordinances; and the right of the city to bring such a suit under the facts alleged was denied by this court. Mr. Justice Frauenthal, speaking for this court, said:

"The violation of such ordinances is an infraction of the criminal law, and the police courts of cities and towns are the proper forums in which to pursue a criminal prosecution for the violation there. A chancery court has no criminal jurisdiction, and will not exercise its powers solely to enforce criminal laws. A complete and adequate remedy for the violation of the criminal statutes of the State and of municipal ordinances is afforded by the courts of law, and those courts have full power to pass upon the scope and validity of such laws and ordinances. It has been held by this court that the chancery court has no jurisdiction to restrain acts solely because they are criminal. *State* v. *Vaughan,* 81 Ark. 117, 98 S. W. 685, 7 L. R. A., N. S., 899, 118 Am. St. Rep. 29, 11 Ann. Cas. 277; *Lyric Theater* v. *State,* 98 Ark. 437, 136 S. W. 174, 7 L. R. A., N. S., 325)."

Let it be noted that in the reported case there was no claim that the criminal law was inadequate; nor was there any claim that the local law enforcement officials would not do their sworn duties. Both of these allegations were made by the Attorney General in the case at bar.

(2) In *Lyric Theater* v. *State*, 98 Ark. 437, 136 S. W. 174, 33 L. R. A., N. S. 325, and in *U. S. Express Co.* v. *State*, 99 Ark. 633, 139 S. W. 637, 35 L. R. A., N. S. 879, there were attempts by the prosecuting attorney to secure an injunction to prevent violations of the criminal laws; and in each of these cases this court denied the jurisdiction of equity. But in neither case was there any allegation that the criminal law was inadequate, or that the local law enforcement officials would not do their sworn duty. In each of these cases, as well as in the case of *DeQueen* v. *Fenton, supra,* there was cited the case of *State* v. *Vaughan,* 81 Ark. 117, 98 S. W. 685, 7 L. R. A., N. S., 899, 118 Am. St. Rep. 29, 11 Ann. Cas. 277, as giving the full reason for the holding made in each case. So we now examine *State* v. *Vaughan* as the parent case.

(3) In *State* v. *Vaughan, supra,* the Attorney General of Arkansas, and the prosecuting attorney, and the mayor and city attorney of Little Rock—all in the name of the State—sought by equitable injunction to close a "bookmaking" establishment in Argenta, operated by the defendant Furth. Chief Justice HILL, speaking for this court, held that equity had no jurisdiction under the allegations in that case, but he pointed out the cases on which equity would have jurisdiction, and one of those cases is alleged in the case at bar. Chief Justice HILL listed three cases where equity would have jurisdiction to grant an injunction, even though the act complained of was a violation of criminal law. He listed these: (1) to restrain purpresture of public highways or navigation, (2) to restrain threatened nuisances dangerous to the health of a community, (3) to restrain *ultra vires* acts of corporations injurious to public rights. Then he pointed out a fourth case where equity would have jurisdiction; and it is that fourth case that gives equity the jurisdiction claimed by the Attorney General here; and that is when " the criminal processes are inadequate to afford relief from the connivance of the officers or other reasons." Chief Justice HILL said:

"On the other hand, if the public nuisance is one touching civil property rights or privileges of the public,

or the public health is affected by a physical nuisance, or if any other ground of equity jurisdiction exists calling for an injunction, a chancery court will enjoin, notwithstanding the act enjoined may also be a crime. The criminality of the act will neither give nor oust jurisdiction in chancery. Applying these principles here, it is seen that the admissions of the answer prove Furth to have been daily violating the criminal laws, but there is an absence of any showing that the acts constituting the crime reached to any of the grounds of equity jurisdiction. *In some cases where the jurisdiction of equity is sought to restrain a criminal nuisance, there are allegations that the criminal processes are inadequate to afford relief from connivance of the officers or other reasons.* Happily, that unfortunate situation is not presented here; the prosecuting attorney joins in this complaint, and allegations involving the officers of Argenta in the maintenance of this poolroom were denied in the answer, and the State elected to treat the answer as true. It is not only the right, but the sworn duty, of every prosecuting attorney to proceed by information in justice's or circuit court to close these illegal places when they have information of them; it is not only the right but the duty of every grand jury to find the existence of such places if they exist and to indict the keepers thereof. It is also the privilege of any citizen to proceed against them at any time by affidavit before a justice of the peace.'' (Italics our own.)

We emphasize that this court recognized in *State* v. *Vaughan, supra,* that equity has jurisdiction where ''the criminal processes are inadequate to afford relief, from connivance of the officers or other reasons.'' That is exactly the situation alleged by the Attorney General in his petition filed in the case at bar. The petition has been copied in full herein. Whether the allegations, concerning the local law enforcement officials, are true is a matter of proof; but the demurrer admitted the truth of these allegations for the purpose of this ruling; and these allegations are sufficient to give the court of equity jurisdiction in the case at bar. Thus, the review of our cases

demonstrates the right of equity to act in accordance with the general rule.

In the case of *State* v. *Sportsmen's Country Club*, 214 Mont. 151, 7 N. W. 2d 495, the Supreme Court of Minnesota upheld the right of equity to grant an injunction in a case ''where there have been continuous and persistent violations of the liquor and gambling statutes and repeated convictions have failed to abate them,'' saying: ''The remedies at law, that of prosecution under the gambling and liquor laws, prosecution for violation of the public nuisance statute, and the legal remedy of abatement after judgment, are inadequate.''

The case of *Respass* v. *Commonwealth*, 131 Ky. 807 115 S. W. 1131, 21 L. R. A., N. S. 836, cited on the previous point, is also directly in point here. The Kentucky Court of Appeals, in holding that equity has jurisdiction to grant an injunction, used this very pertinent language:

''The chancellor may not enjoin the defendants from operating a pool room anywhere; but he may enjoin them from so using the property referred to in the judgment as to make that property a public nuisance. The court of chancery will not restrain personal conduct, but it will restrain the unlawful use of property. In *Com.* v. *McGovern*, 116 Ky. 212, 73 S. W. 261, 66 L. R. A. 280, we showed that the jurisdiction of the courts of equity in regard to public nuisances may be traced back to the reign of Queen Elizabeth, and may be exercised where the nuisance affects the health, morality or safety of the community; the ground of jurisdiction being the ability of the chancellor to give a more complete and perfect remedy than is attainable at law, by arresting (stopping) the nuisance that is in progress, and protecting the public against it by perpetual injunction. If the defendants were sending into the air from their property poisonous vapors that destroyed the health of the community, for the protection of life the chancellor might enjoin them from so using their property; or, if they had upon their premises in the city of Covington a manufactory of some deadly explosive, which constantly endangered the safety of the city, the chancellor might enjoin this use

of their property, for the protection of the public, without waiting for the tardier processes of law, which might not be effective until great loss of life had ensued. It was in effect conceded in the argument that, in such cases as these, for the protection of health or personal safety, the chancellor might intervene by injunction.

"But it was earnestly insisted that the rule should not be applied to nuisances which affect only the morals of the community. We cannot see the force of the distinction. The State is interested in the character of its people, no less than in their health or personal safety. The character of a State depends upon the character of the individuals constituting it. If the people become depraved, the State cannot long exist. It may have wealth, it may have all that goes to make a great State, and yet, if its men are without character, it is a crumbling ruin. The State is as much interested in restraining those things which destroy the character of its people, as in those things which destroy their health or personal security. A house such as is described here is not only a rendezvous for the vicious, but a training school to make others like them. That such a house is a public nuisance has been often declared. . . . To say that a court of equity may not enjoin a nuisance of this sort, when the criminal laws have proven inadequate, is to say that the commonwealth is unable to protect its citizens. If it may protect its citizens by injunction from such a use of property as would breed a pestilence among the people, upon what principle can it be maintained that it may not, by injunction, prevent that use of property which, while it does not destroy the body, destroys the character, and leaves only the image of a man, unfitting him for the duties of citizenship?"

We join the Kentucky court in holding that the state may properly seek to protect the community by asking the aid of a court of equity where the criminal law enforcement agencies have broken down, and thereby rendered the remedy at law to be inadequate and incomplete.

It, therefore, follows that the decree of the chancery court, denying the petition, is reversed; and the cause is

remanded with directions to overrule the demurrer, and for further proceedings not inconsistent with this opinion.

SMITH, McHANEY and ROBINS, JJ., dissent.

SMITH, J., dissenting. The operation and effect of the majority opinion will not be confined to Garland county, but applies, of course, to the whole state, and its practical effect is to impose upon chancery courts a supervisory jurisdiction over the law courts in the matter of enforcing the criminal laws of the state. In my opinion this jurisdiction was not conferred upon chancery courts by the Constitution of the state.

The observation of Chief Justice HILL in the case of *State* v. *Vaughan,* 81 Ark. 117, 98 S. W. 685, 7 L. R. A., N. S. 899, 118 Am. St. Rep. 29, 11 Ann. Cas. 277, strongly relied upon by the majority to support its order awarding injunctive relief, was made *arguendo* and is *obiter* for as that opinion expressly states, there were no allegations that the criminal processes were inadequate to enforce the criminal law, and as a matter of fact, the injunction there prayed for to restrain as a nuisance a pool room where bets were made, and money won and lost on horse races, was denied. The chancellor, Judge HART, of honored memory, later a member of this court, and its Chief Justice at the time of his death, denied injunctive relief, and that action was affirmed in the Vaughan case. That opinion concludes with a statement that: "The chancellor was right in refusing to entertain jurisdiction, and the judgment is affirmed." That opinion quoted from the case of In re *Debs,* 158 U. S. 564, 15 S. Ct. 900, 39 L. Ed. 1092, the following statement; "Again, it is objected that it is outside of the jurisdiction of a court of equity to enjoin the commission of crimes. This, as a general proposition, is unquestioned. A chancellor has no criminal jurisdiction. Something more than the threatened commission of an offense against the law of the land is necessary to call into exercise the injunctive powers of the court. There must be some interferences, actual or threatened, with property or rights of a pecuniary nature; but when such inter-

718

ferences appear, the jurisdiction of the court of equity arises, and is not destroyed by the fact that they were accompanied by, or are themselves, violation of the criminal law.''

There is no allegation here that there has been any interferences actual or threatened, with property or rights of a pecuniary nature, it being alleged only that the common law courts were not performing their duty in the enforcement of the criminal law of the state.

Whatever the rule may be elsewhere, it has been very definitely and repeatedly decided by this court that the jurisdiction of courts has been parceled out by the Constitution, and that this jurisdiction cannot be enlarged even by an act of the General Assembly. Here the court below was called upon to act even without that authority. It is, therefore, unimportant what the duty of attorneys general, or the jurisdiction of the chancery court may have been at the common law, as our Constitution has defined the jurisdiction of our courts, and no action of the attorney general can enlarge it by showing what the duty and powers of similar officers were at the common law in the abatement of common law nuisances.

The General Assembly, at its 1905 session, passed Act 328, page 782, which attempted to confer jurisdiction upon chancery courts to hear election contests. In reviewing this legislation and declaring it invalid, in the case of *Hester* v. *Bourland,* 80 Ark. 145, 95 S. W. 992, Justice BATTLE recited the provisions of our Constitution parceling jurisdiction among the courts of the state and there said: ''The Constitution divides and parcels the judicial power of the state among the courts named. The General Assembly is authorized to create only three classes of courts, corporate, common pleas and chancery courts, and the jurisdiction with which they may be vested is specified. It can vest chancery courts only with jurisdiction in matters of equity. All other jurisdiction is vested in other courts. The Legislature is without power to divest or change it. Any law passed for that purpose would be unconstitutional and void.''

It was held in the case of *City of DeQueen* v. *Fenton,* 98 Ark. 521, 136 S. W. 945, that a court of equity will not exercise jurisdiction by way of injunction to stay proceedings in matters or acts which are solely of a criminal nature, or in any case not strictly of a civil nature. It was held in the case of *Lyric Theatre* v. *State,* 98 Ark. 437, 136 S. W. 174, 33 L. R. A., N. S. 325, that before an injunction will be issued restraining acts constituting a public nuisance, it is necessary that such nuisance effect the civil or property rights or privileges of the public, or the public health, and that it is not sufficient that such acts are criminal.

In that case, it was sought to enjoin the operation of a moving picture show on Sunday and the opinion recites, that it was urged that the giving of these performances upon Sunday constituted an infraction of the law against Sabbath breaking, and that they gathered together an assembly of lawless and turbulent persons, and that this constituted a public nuisance. Answering that argument the court said: ''But the illegal acts thus complained of were only violations of the criminal laws; and the courts of equity will not interfere simply for the purpose of restraining acts constituting crimes because they are criminal. Courts of equity do not exercise their powers to enforce the criminal laws.'' It was there further said: ''It is true that courts of equity have jurisdiction to enjoin acts constituting public nuisances and to abate them. But such jurisdiction is interposed solely for the protection of property or of civil rights; and, whether the nuisance be private or public, the same principal must guide the interference of a court of equity in both cases. In the absence of an injury to property or to civil rights, the chancery court has no jurisdiction to restrain acts simply because they are criminal, nor has it the power to enforce the performance of moral duties solely as such.''

In the case of *U. S. Exp. Co.* v. *State,* 99 Ark. 633, 139 S. W. 637, 35 L. R. A., N. S., 879, it was said that an injunction would not lie to prevent a common carrier from bringing intoxicating liquors into prohibition territory

merely because the intoxicating liquors caused a nuisance, drunkenness, and debauchery, resulting from the sale of the same, as injunction would not issue merely to prevent the commission of crime.

In the case of *Hill* v. *Crater,* 182 Ark. 1007, 33 S. W. 2d 371, it was sought to enjoin certain persons from interfering with the holding of religious services, it being alleged that such action was a misdemeanor and would cause a disturbance of the peace. The relief prayed was denied, it being held that chancery courts will not ordinarily enjoin the commission of crime.

In the case of *Ferguson* v. *Martineau,* 115 Ark. 317, 171 S. W. 472, Ann. Cas. 1916E, 421, prohibition was awarded against a chancellor who sought to interfere with the judgment of the circuit court imposing a death sentence, and in granting the writ of prohibition Judge Wood said: "Courts of equity have to do with civil and property rights, and they have no jurisdiction to interfere by injunction with criminal proceedings. They cannot stay process of courts having the exclusive jurisdiction of criminal matters, where no civil or property rights are involved. *Portis* v. *Fall, et al.,* 34 Ark. 375; *Medical & Surgical Institute* v. *Hot Springs,* 34 Ark. 359; *Taylor Cleveland & Co.* v. *Pine Bluff,* 34 Ark. 603; *Waters-Pierce Oil Co.* v. *City of Little Rock,* 39 Ark. 412; High on Injunctions, § 68; Kerr on Injunctions in Equity, p. 2, Star; 1 Wharton Cr. Law, § 403." In addition to these, the following cases are to the same effect: *New Home Sewing Machine Co.* v. *Fletcher,* 44 Ark. 139; *Rider* v. *Leatherman,* 85 Ark. 230, 107 S. W. 996; *Dreyfus* v. *Boone,* 88 Ark. 353, 114 S. W. 718; *Merritt* v. *Gravenmier,* 169 Ark. 779, 227 S. W. 526.

In the case of *Ferguson* v. *Martineau,* Judge Wood quoted from the case In re *Sawyer,* 124 U. S. 200, 8 S. Ct. 482, 31 L. Ed. 402, the following statement: "The office and jurisdiction of a court of equity, unless enlarged by express statute, are limited to the protection of rights of property. It has no jurisdiction over the prosecution, punishment or pardon of crimes and misdemeanors, or

over the appointment or removal of public officers. To assume such a jurisdiction or to sustain a bill in equity to restrain or relieve against proceedings for the punishment of offenses, or for the removal of public officials, is to invade the domain of the courts of common law, or of the executive and administrative departments of the government."

It was there further said: "This court in *State* v. *Vaughan,* 81 Ark. 117, 98 S. W. 685, 7 L. R. A., N. S. 899, 118 Am. St. Rep. 29, 11 Ann. Cas. 277, quoting from the Illinois Supreme Court, said: 'It is elementary law that the subject-matter of the jurisdiction of the court of chancery is civil property. . . . The court has no jurisdiction in matters merely criminal or merely immoral, which do not affect any right to property. It is no part of the mission of equity to administer the criminal law of the state. A court of equity has no jurisdiction over matters merely criminal or merely immoral.' "

The majority opinion copies the complaint, and it contains no allegations which impeached the circuit court of Garland county; it states only the conclusions of the pleader. It does not allege that indictments were sought and not returned, and does not allege that any jury had failed and refused to convict in any case where there was testimony warranting and requiring that action. It contains only the general allegation that the law had been frequently violated without action being taken to prevent these violations. The opinion in the Kentucky case from which the majority so extensively quote, contains the recital that: "The nuisance has continued in the place for many years, despite the processes of the criminal court." Here, as we have said, there is no allegation that these processes have been invoked, the inactivity only of the court being alleged. At § 1347, Pomeroy's Equity Jurisprudence, vol. 4, 5th Ed., it is said: "Injunction is never granted (merely) to restrain criminal acts; (crimes are confided to the criminal courts, and the remedy by indictment and prosecution is deemed to be adequate). . . . In proper cases an equity court will interpose for the protection of property rights al-

though the injurious acts constitute violations of the criminal law.''

The jury system has been the palladium of the liberty of all English speaking people. It is slow and cumbersome, and often miscarries, but it has preserved our liberty from the aggression of oppressors occurring in other lands, and we should hesitate to exchange it for a system which permit one man, although a chancellor, to usurp its functions. Our Constitution has sought to prevent this from being done in parceling out the jurisdiction of the courts of the state, which are supposed to, and ordinarily do, enforce the laws, and it was not contemplated in the Constitution that short cuts in the enforcement of the criminal law might be taken, just to get quick results.

It is, therefore, my opinion, shared by Justices Mc-Haney and Robins, that the order from which is this appeal should be affirmed.