GULLEY *v.* BUDD.

4-7705                                         189 S. W. 2d 385

Opinion delivered July 9, 1945.

24

*Jeff Duty, Glenn Wing, Guy E. Williams,* Attorney General, and *Oscar E. Ellis,* Assistant Attorney General, for appellant.

*G. T. Sullins, Rex W. Perkins* and *John M. Lofton, Jr.,* for appellee.

MILLWEE, J.   On July 10, 1944, E. A. Budd was found guilty of the crime of voluntary manslaughter and given a sentence of five years in the penitentiary from which judgment an appeal was duly prosecuted to this court, which, after having been perfected, was dismissed on his motion January 2, 1945.

On January 5, 1945, the Governor of the State issued a pardon to Budd which reads as follows:

"To All to Whom These Presents Shall Come— Greeting:

"Whereas, E. A. Budd, of Fayetteville, was at the April, 1944, term of the Washington County Circuit Court convicted of the crime of voluntary manslaughter and sentenced to five years in the penitentiary; and

"Whereas, statements by several outstanding physicians and surgeons of Fayetteville, and Washington county, give as their unanimous opinion that the death of the deceased was not caused by any altercation she may have had with the defendant and state emphatically she was suffering from a brain tumor which undoubtedly caused her death several weeks later and they state that had an autopsy been performed they believe this point would have been proven conclusively; and

"Whereas, these physicians also stated that Mr. Budd is suffering from and is now being treated for a heart ailment and his commitment to the penitentiary at age sixty-seven (67) years would be equivalent to taking his life; and

"Whereas, a large number of outstanding citizens, including businessmen, city and county officials, bankers, ministers, and professional men of all types have urged that he has suffered sufficiently; and

"Whereas, a number of the jurors have likewise recommended that he be given a pardon; and

"Whereas, this pardon is being issued without solicitation of paid representation or attorney.

"Now, therefore, I, Homer M. Adkins, Governor of the State of Arkansas, by virtue of the authority vested in me do hereby grant a full and complete pardon to the said E. A. Budd, and all rights of citizenship are hereby restored.

"In testimony whereof, I have hereunto set my hand and caused to be affixed the Great Seal of State at Little Rock this 5th day of January, 1945.

"Homer M. Adkins, Governor.

"Attested: Secretary of State: C. G. Hall."

On January 13, 1945, the prosecuting attorney, who had represented the State, procured from the clerk of the circuit court where Budd had been convicted a commitment directing the sheriff of the county to take Budd into custody and deliver him to the keeper of the State penitentiary.

Knowing that this pardon had been granted, the clerk declined to issue the commitment until advised so to do by the Attorney General's office. Upon being advised of the issuance of the commitment, Budd's attorneys on the day of its issuance filed in the chancery court a petition for a temporary restraining order which was issued by the county judge, in the absence of both the circuit judge and the chancellor from the county.

The sheriff of the county testified that when he received the commitment he began looking for Budd and would have taken Budd into custody but for the restraining order. On January 15, 1945, the chancellor then being in Washington county where Budd had been tried and convicted, the injunction proceeding was dismissed and Budd surrendered himself to the custody of the sheriff upon whom a writ of *habeas corpus* was immediately served requiring him to appear before the chancellor and show cause why he detained Budd in custody. A hearing before the chancellor was concluded on February 13, 1945, and Budd's discharge was ordered and this appeal is from that decree.

It is first insisted that the writ did not lie for the reason that Budd had voluntarily procured his own arrest, but this position cannot be sustained. It is true Budd voluntarily surrendered to the sheriff, which he did after being advised that he was pursuing the wrong remedy in seeking to enjoin the sheriff from taking him into custody. Budd's attorneys were aware that the sheriff had a writ for Budd's arrest and that Budd would be taken into custody unless proper action was taken to prevent this from being done. The commitment was not issued with the consent or at the connivance of Budd, and if his pardon was valid, he had the right to take appropriate action to prevent the sheriff from arresting

him, as the sheriff was about to do, and would have done but for the temporary injunction.

It is next contended that the chancery court was without jurisdiction to issue the writ of *habeas corpus,* but that contention cannot be sustained. Express authority to issue the writ, either in term time or in vacation, is conferred upon the chancellors of this state by § 6347, Pope's Digest, where it is alleged that the petitioner for the writ is being illegally deprived of his liberty. Budd attempted the practice pursued and approved in the case of *Horton* v. *Gillespie,* 170 Ark. 107, 279 S. W. 1020, and *Nelson* v. *Hall,* 171 Ark. 683, 285 S. W. 386.

It is next insisted that the Governor was without power to grant the pardon inasmuch as it was issued without compliance with the provisions of Act 154 of the Acts of 1903, p. 270, appearing as §§ 4218 *et seq.,* Pope's Digest. This Act was construed and held constitutional in the case of *Horton* v. *Gillespie* and followed in the case of *Nelson* v. *Hall, supra.*

It was held in the Horton case that the provisions of the Act were mandatory and that the power of the Governor to pardon is not absolute, but is subject in its exercise to such regulations as the Legislature may see proper to impose which do not substantially deprive the Chief Executive of this power.

It is conceded that no notice of the application for Budd's pardon was published and the insistence is that this failure rendered the pardon void inasmuch as applications for the pardon were made by paid representatives of Budd. The Horton case, *supra,* reviewed and construed the provisions of Act 154, *supra,* and stated the conditions under which notice must be given and other conditions under which the pardon might be granted, although no notice of the application had been published. It was there said (170 Ark. 107, 279 S. W. 1024):

"Section 4 further provides that the Governor, acting upon his own motion, or being prompted by the result of an investigation made at his instance, shall have the right to grant a pardon in any case without the publica-

tion being made under either § 2 or 3 of the act. After enumerating the exceptions stated above, when publications shall not be required, it is further provided in § 4 that 'all such pardons so granted by the Governor shall state on the face of the certificate thereof that the same was granted by the Governor without application therefor being made to him by any attorney or paid representative of the person pardoned.' '' The pardon to Budd contained that recital in substance.

Now the testimony shows that paid attorneys of Budd solicited various persons to intercede with the Governor for the issuance of the pardon, but Act 154 contains no inhibition against a paid attorney soliciting another person to intercede with the Governor to grant a pardon. The inhibition is against the attorney himself or other paid representative interceding with the Governor. If he does so and thus attempts to influence the Governor to grant the pardon, the law in that event imposes the requirement that notice of the application be given. But if this is not done, and no paid representative intercedes with the Governor he, the Governor, is authorized to act and to grant a pardon, although no notice of the application had been given. In other words, the Governor may grant a pardon where no notice of the application was published provided no intercession for that act is made by an attorney or paid representative, and if and when a pardon is thus granted, that fact shall be recited in the pardon itself. If this recital is not conclusive of the fact recited, a question unnecessary here to decide, it is certainly *prima facie* true, and if that recital may be shown to be false, certainly the burden is upon the person that makes that charge to substantiate it, and that was not done in the instant case. Many persons of high character and unquestioned standing did intercede with the Governor to grant the pardon, one personally, others by letters, but there is no proof that any of these persons were paid for so doing. We must, therefore, hold that the Governor acted in conformity with the requirements of the law as stated by him in the pardon and not in violation of the law.

It is not probable that many, if any, pardons are granted unless in some manner someone calls to the Governor's attention matters which suggest that a pardon should be granted, and the law does not prohibit such suggestions, and the Governor may act thereon even in the absence of the publication of notice, unless the person making the suggestion and request is an attorney or paid representative.

It is insisted that the record does not show that Budd was financially unable to pay for the publication of the notice of the application for the pardon, and that the contrary is true in that he was able to pay the cost of publication of the notice, but the statute does not make inability to pay a prerequisite for the issuance of a pardon in this manner. It provides that, ". . . The Governor, acting upon his own motion, or being prompted thereto by the result of investigations made at his instance, shall have the right to grant a pardon in any case without the publication provided for herein . . . ," in which case it must be stated in the pardon that it was granted without application therefor by an attorney or paid representative.

It is insisted that the pardon was procured through fraud practiced upon the Governor, the fraud consisting of false statements of fact made to the Governor. He has not said so. His deposition was not taken and there is no showing that he did not act advisedly.

We are without power to review the Governor's discretion in issuing this pardon and it is unimportant whether we approve or disapprove that action. The discretion is his and not our own, and we may consider only the Governor's power to act.

The case of *Rathbun* v. *Baumel*, 196 Ia. 1233, 191 N. W. 297, 30 A. L. R. 216, is a decision by the Supreme Court of Iowa, written by a divided court, in which the right of a court of equity to cancel a pardon on account of fraud practiced upon the Governor in its issuance is considered. Many authorities were reviewed and the conclusion was reached that fraud in the procurement of a

pardon, as in the case of any other written instrument, vitiates the instrument in the hands of one seeking to benefit thereby, and that a court of equity has the power to investigate title to a pardon which is attacked on the ground that it was procured by the applicant's fraud on the Governor, and that the entertainment by the courts of such a suit is not an interference with the executive as would be an investigation of fraud by the Governor in issuing the pardon.

There was a strong dissent in this case written by one member of the court and concurred in by another which took the position that, if such a suit could be maintained at all, it must be instituted by the Governor himself and not by another. The dissenting justices said: "If he discovers such fraud or deceit and is disposed to waive the affront and permit the pardon to stand, no other person or authority may rightfully object, but, having discovered it, there is no constitutional provision or reason which prohibits him from applying to the court and on due notice to the holder of the pardon asking a decree of cancellation of the grant, but, in the absence of any such complaint on his part, neither the court nor any public officer or citizen is entitled to assume or exercise powers of guardianship over the executive or to interfere in any matter upon any pretense in the exercise of the executive discretion."

This statement, however, was not the opinion of the court, but the majority did discuss the quantum of proof necessary to cancel the pardon on account of fraud practiced upon the Governor and the majority quoted with approval the following statement from Wharton's Criminal Procedure, vol. 2, § 1469: "A pardon fraudulently procured will, it has been held, be treated by the courts as void. And this fraud may be by suppression of the truth as well as by direct affirmation of falsehood. Yet this test should be cautiously applied by the courts, for there are few applications for pardon in which some suppression or falsification may not be detected. It is natural that it should be so, when we view the condition of persons languishing in prison, or under sentence of

death; and if departure from rigid accuracy in appealing for pardon be a reason for canceling a pardon, there would be scarcely a single pardon that would stand. The proper course is to permit fraud to be set up to vacate a pardon only when it reaches the extent in which it would be admissible to vacate a judgment. And an erroneous recital is no proof of fraud.''

The quantum of proof required to set aside a pardon on the ground that it was procured by fraud is the same that would be required to set aside a judgment or decree of a court on the ground that it was procured by fraud and many cases have announced the requirement as follows: ''Fraud as the basis of an action to impeach a judgment, must be a fraud extrinsic of the matter tried in the cause; it must not consist of any false or fraudulent action or testimony the truth of which was or might have been in issue in the proceeding before the court which resulted in the judgment that is assailed; it must be a fraud practiced upon the court in the procurement of the judgment.'' The law was thus declared in the case of *Turley* v. *Owen,* 188 Ark. 1067, 69 S. W. 2d 882, quoting from the case of *Cassady* v. *Norris,* 118 Ark. 449, 177 S. W. 10. Other cases to the same effect are the following: *Burbridge* v. *Gotsch,* 107 Ark. 136, 154 S. W. 200; *Reeves* v. *Conger,* 103 Ark. 446, 147 S. W. 438; *Hall* v. *Cox,* 104 Ark. 303, 149 S. W. 80; *Holland* v. *Wait,* 191 Ark. 405, 86 S. W. 2d 415; *Baker* v. *State,* 201 Ark. 652, 147 S. W. 2d 17; *Kersh Lake Drainage Dist.* v. *Johnson,* 203 Ark. 315, 157 S. W. 2d 39.

The only fraud alleged or attempted to be shown was that inaccurate statements of fact were made to the Governor. Among other statements were the opinions of four doctors as to the cause of the death of the woman Budd was alleged to have killed, these being to the effect that in the opinion of the doctors Budd had not killed the woman. But the pardon recites that these statements were the opinions of the doctors and no attempt was made to show that the doctors did not entertain the opinion expressed, however erroneous it may have been. Another doctor stated the condition of Budd's health and

the truth thereof is not denied. In addition this doctor expressed the opinion that Budd's confinement in the penitentiary would probably result in his death. Other letters to the Governor expressed the opinion that Budd had been sufficiently punished, which may or may not be true, and four members of the trial jury recommended clemency. We do not consider or decide whether this recommendation should have induced the Governor in the exercise of sound discretion to have granted the pardon, for as has been said, it was he and not we who had the right and power to exercise discretion. But we do hold that such representations all made by responsible persons whose veracity is not questioned, except to say they were mistaken, do not support the finding that the pardon was procured by fraud practiced upon the Governor.

In the appellants' brief, in discussing the power of the Governor to grant the pardon, there is the following language: "Also § 12773 of Pope's Digest is § 6 of Act 178 of 1937 and provides in brief that the Board of Pardons and Paroles shall investigate and consider all applications for executive clemency and make recommendations thereon to the Governor. We submit that this requirement is no less mandatory than are those of the act of April 20, 1903 (§§ 4218 to 4222, Pope's Digest), which have as heretofore been seen by this court held to be mandatory. There was no compliance with either of these acts. There is not even any contention that Act 178 of 1937 (§ 12773 of Pope's Digest) was even attempted to be complied with. It is agreed that the whole file in the Budd pardon was admitted in evidence and appears in this record. There is nothing therein showing a compliance with § 12773 of Pope's Digest."

The above quotation is the only reference to § 6 of Act 178 of 1937 (§ 12773 of Pope's Digest), that we have been able to find in the entire transcript and briefs; so it is clear that this act is mentioned for the first time in the brief on appeal.

When Budd filed his petition for *habeas corpus* and pleaded his pardon, the appellants filed a ten-page re-

sponse; and the five points mentioned below are the only ones therein pleaded by appellants:

(1)   Lack of chancery jurisdiction;

(2)   Voluntary surrender to custody;

(3)   Lack of power of the Governor to grant the pardon, because the notice of application therefor was not published;

(4)   Invalidity of the pardon because of the absence of the statutory words from the face of the pardon, the statutory words being "without application therefor being made to him by an attorney or paid representative of the person pardoned";

(5)   Fraud in the procurement of the pardon. These same five points are the ones listed in the appellants' brief as the ones relied upon. It will be observed that no reference to § 6 of Act 178 of 1937 (§ 12773, Pope's Digest) was contained in the response in the chancery court, and that no evidence was offered concerning any action or failure to act on the part of the pardon board.

In his petition for *habeas corpus* Budd pleaded his pardon. In *Horton v. Gillespie, supra,* it was said: "It may be first said that pardons are to be liberally construed in favor of the pardonee, and that there is a presumption in favor of their validity." With the presumption in favor of the validity of the pardon, the burden was on the appellants to allege and prove that the pardon was illegal. If appellants had desired to claim that § 6 of Act 178 of 1937 (§ 12773, Pope's Digest) was applicable to this case and had not been complied with, then appellants should have pleaded the act and proved the facts supporting their contention. This they failed to do. The stipulation to the effect that letters to the Governor were the "entire file in the case" cannot be twisted to constitute a stipulation that there was no compliance with § 6 of Act 178 of 1937, even if that act were applicable.

We reach the inevitable conclusion that § 6 of Act 178 of 1937 (§ 12773, Pope's Digest) was not urged as a contention below, and the argument about it was thrown into

the brief in this court as a mere after thought. In *Mo. P. R. Co.* v. *Myers Commission Co.*, 196 Ark. 976, 120 S. W. 2d 693, we said:

"This court has frequently held that no issue can be raised in this court which was not raised in the trial court; and since appellant's present contention was not raised in the trial court, as we have herein pointed out, we believe the relief it is now asking on appeal should be denied. *Bolen* v. *Farmers' Bonded Warehouse*, 172 Ark. 975, 219 S. W. 62; *Leonard* v. *Luther*, 185 Ark. 572, 48 S. W. 2d 242; *Banks* v. *Corning Bank & Trust Co.*, 188 Ark. 841, 68 S. W. 2d 452, *Id.* 292 U. S. 653, 54 S. Ct. 863, 78 L. Ed. 1502; *Illinois Bankers' Life Assurance Co.* v. *Lane*, 189 Ark. 261, 71 S. W. 2d 189."

The question of the effect of § 6 of Act 178 of 1937 (§ 12773, Pope's Digest) on the pardoning power of the Governor is of too great importance to be decided lightly or casually. It would be improper to decide or discuss that section in this opinion because there was neither allegation nor proof in this case as to whether that section was ignored, even if the section were applicable. Therefore, we pretermit any further discussion of it, since the question is not properly presented.

We conclude, therefore, that the chancellor correctly held that the pardon was a valid instrument and Budd's discharge was, therefore, proper. The decree is accordingly affirmed.

GRIFFIN SMITH, C. J., dissents.

McFADDIN, J., concurring. I concur in the result reached in this case by the majority, but I cannot agree with certain statements in the opinion which I consider to be very dangerous dicta. The purposes of this concurring opinion are (1) to demonstrate the dicta, and (2) to point out the dangerous implications therefrom.

I. The majority holds—and I agree thereto—that the appellant failed to prove any fraud in the procurement of the pardon. This holding conclusively disposes of all questions as to what official could raise the issue of

fraud in procuring the pardon; because, if no fraud was shown, then it makes no difference what official might try to raise the question. Therefore, all language in the opinion—as to which official (*i.e.,* the Governor, Attorney General, Prosecuting Attorney, arresting officer, etc.) could raise the issue of fraud in procurement—must be dicta.

Notwithstanding this fact, the majority opinion cites and discusses the Iowa case of *Rathbun* v. *Baumel,* 196 Ia. 1233, 191 N. W. 297, 30 A. L. R. 216, and refers to the fact that there was a strong dissenting opinion in the Iowa case, and, with apparent approval, gives this quotation from the Iowa dissenting opinion in referring to the Governor: "If he discovers such fraud or deceit and is disposed to waive the affront and permit the pardon to stand, no other person or authority may rightfully object, but, having discovered it, there is no constitutional provision or reason which prohibits him from applying to the court and on due notice to the holder of the pardon asking a decree of cancellation of the grant, but, in the absence of any such complaint on his part, neither the court nor any public officer or citizen is entitled to assume or exercise powers of guardianship over the executive or to interfere in any matter upon any pretense in the exercise of the executive discretion."

Certainly, this quotation is dicta, because, when we hold—as we did in the case at bar—that no fraud was shown, then it is immaterial who is seeking to raise the issue of fraud, and all language as to whether the Governor could waive the fraud is dicta, since no fraud was shown.

II. This dicta has dangerous implications. The quotation from the dissenting opinion in *Rathbun* v. *Baumel, supra,* says that the *Governor,* after discovering the fraud, may waive the fraud and permit the pardon to stand and "no other person or authority may rightfully object." This is dangerous. A Governor, in granting a pardon, does not act in a private-capacity, but acts in his official capacity as the chief executive of the state. In 39 Am. Jur. 527, in speaking of the pardoning power, it is

stated: "It is as much an official act as any other act. It is vested in the Governor, not for the benefit of the convict only, but for the welfare of the people, who may properly insist upon the performance of that duty by .him if a pardon or parole is to be granted." And in 39 Am. Jur. 529 the rule is stated: "The Governor, however, does not hold the power simply because he is the chief executive, but because the sole power to pardon is delegated to his *office*."

To say that the Governor may personally waive the fraud is to make the issuance of a pardon a personal or private act, rather than an official act. Any fraud in procuring the pardon is not a fraud against the individual who grants it, but is rather a fraud against the office and the state. If the quoted language from the Iowa dissenting opinion means what it says, then, if a Governor should be absent and a Lieutenant Governor should grant a pardon, the Governor, upon return to the state, could not question the pardon on the basis of fraud in procurement. Furthermore, if the quoted language from the Iowa dissenting opinion means what it says, then the Attorney General of the state could never question a pardon on the basis of fraud in the procurement. These two previous sentences demonstrate how dangerous is the dicta of which I complain. In *Horton* v. *Gillespie,* 170 Ark. 107, 279 S. W. 1020, and in *Nelson* v. *Hall,* 171 Ark. 683, 285 S. W. 386, the Governor, on return to the state, questioned, through the warden of the penitentiary and the sheriff of the county, the validity of the acts of the Lieutenant Governor (there called Acting Governor) in issuing pardons. Those cases did not present the issue of fraud in procurement; but they might well have done so, because the right of the Governor to question the acts of the Lieutenant Governor was not considered of sufficient importance to be raised as an issue. In the recent case of *State, ex rel. Attorney General,* v. *Karston,* 208 Ark. 703, 187 S. W. 2d 327, we had occasion to review the power of the Attorney General, and we there said that the Attorney General was the chief law officer of the state. As such official he should certainly be not only allowed, but required to see, that no fraud be practiced on the office

of Governor in the obtaining of a pardon. To hold otherwise is to restrict the power and duty of the Attorney General as the chief law officer of the state.

The dangerous implications from this dicta impel this separate concurrence.