RANDOLPH, Justice,
dissenting:
Upon the judicial department, because of the nature of its duties, devolves the duty of determining whether in specific instances the other two departments *421 have exceeded the powers granted to them by the Constitution.
Albritton v. City of Winona, 181 Miss. 75, 178 So. 799, 803 (1938).
[N]o citation of authority is needed for the universally accepted principle that if there be a clash between the edicts of the constitution and the [acts of another branch], the latter must yield.
Newell v. State, 308 So.2d 71, 77 (Miss.1975).
¶ 84. Today’s decision is a stunning victory for some lawless convicted felons, and an immeasurable loss for the law-abiding citizens of our State. Our Constitution and numerous holdings of this venerable institution are turned upon their heads by this Court’s relinquishing the inherent judicial function of declaring what the Constitution and our laws say. Today’s decision allows some convicted felons to avoid their constitutional obligations and allows a coordinate branch to eschew multiple constitutional obligations and duties, in favor of those-convicted felons and in total disregard of substantive constitutional rights reserved by the people of Mississippi. Today’s decision refuses to acknowledge that our Constitution provides that “[t]he right of the people ... [to] petition the government on any subject [including pardons] shall never be impaired[,]” and that “[t]he enumeration of rights in this constitution shall not be construed to deny and impair others retained by, and inherent in, the people.” Miss. Const, art. 3, §§ 11, 32 (1890); see also U.S. Const, amend. I (“Congress shall make no law ... abridging ... the right of the people ... to petition the Government for a redress of grievances.”). The people’s substantive right to petition the government has been annulled by the majority’s refusal to require compliance with Article 5, Section 124, by either the convicted felons or the governor. Absent publication — which provides public notice that a convicted felon is seeking a pardon — the general public is silently and blindly cordoned off from the mansion and office of the governor, left unaware that its right to petition the government slowly disappears, before completely vanishing once pen touches paper. By not recognizing the rights of the people proclaimed in Article 3, Sections 11 and 32, my esteemed colleagues fail to discern this immeasurable harm.[73]
¶ 85. Today’s decision contravenes the text of the Constitution;[74] fails to abide by this Court’s 1924 holding that a pardon petition “is required by law to be published before the pardon therein prayed for can be granted[;]”[75] denies that these pardons are renewable, despite review of prior pardons by this Court;[76] fails to consider decisions of other states;[77] fails to consid *422 er legal encyclopedias confirming that conditions precedent to granting a pardon have repeatedly been found reviewable;[78] contradicts learned treatises and legal encyclopedias on Mississippi law;[79] and fails to consider that the United States Supreme Court has reviewed whether pardons were within the President’s power on numerous occasions.[80] Given such great *423 weight of authority, and the majority’s acknowledgment that publication is required by Section 124 (Maj. Op. at ¶¶ 4, 49), the majority’s acquiescence to this untenable accretion of judicial authority to the executive branch is simply perplexing.
¶ 86. Even given this overwhelming authority, the plain language of the text, Article 5, Section 124, still must control our decision, for this Court must declare the Mississippi Constitution as it is written, not as we assume it to be. See Pro-Choice Mississippi v. Fordice, 716 So.2d 645, 652 (Miss.1998) (“Regardless of the result, this Court must enforce the articles of the Constitution as written.”) (emphasis added). As wisely penned by a dissenting justice in the infamous Dred Scott case:
[Wjhen a strict interpretation of the Constitution, according to the fixed rules which govern the interpretation of laws, is abandoned, and the theoretical opinions of individuals are allowed to control its meaning, we have no longer a Constitution; we are under the government of individual men, who for the time being have power to declare what the Constitution is, according to their own views of what it ought to mean.
Scott v. Sandford, 60 U.S. (19 How.) 393, 621, 15 L.Ed. 691 (1857) (Curtis, J„ dissenting).
¶ 87. The pertinent provision of the text committed for our consideration reads as follows:
in cases of felony, after conviction no pardon shall be granted until the applicant therefor shall have published for thirty days ... his petition for pardon, setting forth therein the reasons why such pardon should be granted.[81]
Miss. Const, art. 5, § 124 (1890) (emphasis added) (see Maj. Op. at ¶ 2 for the full text of Section 124).
I. This Court has the power, authority, duty, and responsibility to consider this case.[82]
¶ 88. Article 1, Section 2 reads that no person belonging to any branch of government “shall exercise any power properly belonging to either of the others.” Miss. Const, art. 1, § 2 (1890) (emphasis added). The ultimate power and responsibility for interpreting our Constitution is bestowed upon the judiciary, and that responsibility is the crux of the dispute now before us. See Barbour v. Delta Corr. Facility Auth., *424 871 So.2d 703, 710 (Miss.2004) (“As the highest state court, this Court has the proper authority and responsibility to interpret the Mississippi Constitution of 1890.”); Alexander v. Allain, 441 So.2d 1329, 1333 (Miss.1983) (“The interpretation of the constitution becomes the duty of the judicial department when the meaning of that supreme document is put in issue.”); Marbury, 5 U.S. at 177 (“It is emphatically the province and duty of the judicial department to say what the law is.”). “Could it be the intention of those who gave this power, to say that, in using it, the constitution should not be looked into? That a case arising under the constitution should be decided without examining the instrument under which it arises? This is too extravagant to be maintained.” Marbury, 5 U.S. at 179.
¶ 89. Our Constitution limits the pardoning power of the governor. See Miss. Const, art. 5, § 124 (1890). In the absence of publication, a pardon is outside the scope of the governor’s authority. (See infra, Section II). An act of a governmental officer outside the scope of his authority is justiciable. See Fordice v. Bryan, 651 So.2d 998, 999, 1003 (Miss.1995) (“In interpreting various provisions of our constitution, we are called upon to declare the boundaries beyond which executive action may not pass” and “we will not question his judgment in lawfully exercising his ... power, but we must be available to adjudicate the question whether the manner of its exercise exceeds constitutional parameters”) (emphasis added); State v. Wood, 187 So.2d 820, 831 (Miss.1966) (“this Court has the power to construe the Constitution and thus define the powers of the three branches of our Government.”); Albritton, 178 So. at 803 (“Upon the judicial department, because of the nature of its duties, devolves the duty of determining whether in specific instances the other two departments have exceeded the powers granted to them by the Constitution.”); Broom v. Henry, 136 Miss. 132, 100 So. 602, 603 (1924) (“when [the governor] has acted, ... the legality of the act is a judicial question for the courts.”); 59 Am. Jur. 2d Pardon and Parole § 44 (2002) (“the courts have jurisdiction to determine the validity of a pardon, as affected by the question whether the official granting it had the power to do so.”). The majority concedes this truth, providing that “[i]f an officer attempts to exercise an authority not legally vested in him, or attempts to do so when the state of facts does not entitle him to assert authority, such action is subject to judicial review.” (Maj. Op. at ¶ 43) (citing State v. McPhail, 182 Miss. 360, 180 So. 387, 391 (1938)). See also Maj. Op. at ¶ 23 (“the judiciary does possess the power to review ... executive action exceeding constitutional limits ....”) (citing Nixon v. U.S., 506 U.S. 224, 238, 113 S.Ct. 732, 122 L.Ed.2d 1 (1993)). Thus, this case presents a justiciable question — whether the governor had the constitutional authority to grant all of these pardons, in the absence of compliance by some of the putative pardonees with the textually-committed limitations established by the Constitution for a pardon to be granted.
¶ 90. Our predecessors have provided a blueprint for us to perform this task, providing that we must:
test this [dispute] by the touchstone of the constitution of the state. This is the only proper, legal and safe criterion by which it can be judged and decided upon. In doing so, we must be careful to allow no hypothetical interpretations, or equivocal definitions of the explicit text of this instrument. It is a compact between the people and their officers. There are restraints placed upon both. Power to govern has been confided, but *425 it has also been limited and restricted. It remains then to examine whether the exercise of power in the case now under consideration, is within the constitution and laws of this state.
Ex parte Hickey, 12 Miss. 751, 779,1845 WL 1999, at *13 (1844) (emphasis added). Significantly, the United States Supreme Court has specifically found that the review of pardons is justiciable, stating that a pardon:
may be absolute or conditional. It may be controverted by the prosecutor, and must be expounded by the court. These circumstances combine to show, that this, like any other deed, ought to be brought “judicially before the court, by plea, motion or otherwise.”
Wilson, 32 U.S. at 161. Similarly, when the State controverts a pardon, as here, the courts have a duty to expound upon it.
¶ 91. Hooker, et al, and amicus assert that the Court should blink, wink, and nod at the putative pardonees’ failure to follow the explicit language of the Constitution. To now do so, because the executive branch chose to, is an act of judicial timidity of the highest (or is it the lowest?) order. Can these putative pardonees ignore the Constitution? The Constitution says no. Can the governor ignore the Constitution? The Constitution says no. Does the executive branch possess the right to deny and impair substantive rights “retained by, and inherent in, the people”? See Miss. Const, art. 3, § 32 (1890). The Constitution says no. Does the executive branch possess the right to waive the people’s substantive right to “petition the government on any subject”? See Miss. Const, art. 3, § 11 (1890). The Constitution says no.
¶ 92. The majority relinquishes the constitutional question to the governor, and then concludes that the governor’s decision is not reviewable by a court. See Maj. Op. at ¶¶ 5, 27, 45. Where does the Constitution impart to the governor the power to be the sole judge of the validity or legality of his actions? There is no textual commitment to the executive branch for the interpretation of the Constitution.[83] This Court lacks the authority to cede power bestowed upon it by the people, or to sponsor an accretion of this power to the executive branch. Such shifting of constitutional authority and duty can be done only by constitutional amendment.[84] Indeed, McPhail, cited by the majority, disapproved of subordination to a coordinate branch. See McPhail, 180 So. at 391 (“If any officer, be he high or low, attempt to exercise an authority not legally vested in him, ... his action thence is as much the subject of judicial review and remedial rectification as is the action of any private person.”).
¶ 93. The executive branch cannot nullify, negate, or ignore the Constitution or usurp the role of the judiciary in interpreting it. The people empowered the *426 judiciary with the interpretation of our Constitution, to objectively declare if the Constitution has been ignored or trampled upon. To abdicate or concede the inherently judicial function of interpreting the Constitution to the executive branch is neither wise, prudent, nor constitutionally permissible. Such concession defies the Constitution and blatantly avoids the expectations of those who elected us to perform our duties. The Court should never shirk its responsibility to exercise the powers entrusted to it by the people. It is a violation of the sacred trust the framers of that great document placed in those who have served, serve, and will serve on this Court. Granting the executive branch the sole authority to decide the legality or validity of its actions and declaring its decision nonreviewable eviscerates the Constitution and jeopardizes the rights of every citizen.
II. The governor lacked authority to pardon any convicted felon until after publication.
¶ 94. Our Constitution bestows the power to pardon upon only one-the governor. Miss. Const, art. 5, § 124 (1890). The putative pardonees would stop the inquiry there. But the pardoning power exists only to the extent that the people have constitutionally granted it. See Whittington v. Stevens, 221 Miss. 598, 603, 73 So.2d 137, 139 (1954) (“The power [to pardon] is one inherently vested in the people, who, by constitutional provision, may vest it where they choose.”); Schick, 419 U.S. at 267, 95 S.Ct. 379 (“the pardoning power is an enumerated power of [a] Constitution and ... its limitations, if any, must be found in [a] Constitution itself.”) (emphasis added); Montgomery v. State, 231 Ala. 1, 163 So. 365, 368 (1935) (it is only “where the pardoning power is conferred on the executive without express or implied limitations [that] the grant is exclusive”) (emphasis added) (citation omitted); State v. Shumaker, 164 N.E. 408, 409 (1928) (“[A]ll sovereign power is vested in the citizens of the state; and the citizens have the power, by virtue of such sovereignty, to do whatever, whenever, they please, except by their own limitation as expressed in the highest law that may emanate from the sovereign power, the Constitution.”) (emphasis added); 59 Am. Jur. 2d Pardon and Parole § 15 (2002) (“Under the American form of government, the pardoning power is neither naturally nor necessarily an executive power. It is a power of government inherent in the people, who, by constitutional provision, may vest it, in whole or in part, in any official, board, or department of government they so choose.”) (emphasis added). Constitutional limitations upon, or conditions precedent to, exercise of the pardoning power either prohibit or restrict the effectual validity of a pardon. See Chevron U.S.A., Inc. v. State, 578 So.2d 644, 648 (Miss.1991) (providing that the Constitution is the supreme law in our state, and “[n]o act prohibited by it can be given effectuality and validity.”) (citation omitted). Only in the valid exercise of conferred power is the governor “the sole judge of the sufficiency of the facts and of the propriety of granting [a] pardon. ...” Cleveland, 98 So. at 114.
¶ 95. Hooker, et al, confirm that the “[cjonstitutional text dictates the result.” We cannot know with certitude the framers’ intent in placing limitations in the text of the Constitution, but we can with certitude view the express words used in the framers’ textual commitment to publication, and know with certitude that the Constitution means what the words say. See McPhail, 180 So. at 389 (constitutional and statutory provisions “mean what is in the ordinary import of the language *427 used”); Lee v. Mem’l Hosp. at Gulfport, 999 So.2d 1263, 1270 (Miss.2008) (Dickinson, J., dissenting) (“judges are without constitutional authority to waive or diminish constitutionally-enacted ... requirements. Instead, ... requirements which are not open to interpretation as to quantity or quality ... must be complied with, and no analysis is needed.”). Mississippians did not bestow upon the governor an unconditional grant of authority to pardon. Section 124 expressly limited the authority to pardon in three ways: (1) the governor has no power to grant reprieves to those convicted of treason or to remit forfeitures, without the consent of the Senate; (2) the governor has no power to grant a pardon before a conviction; and (3) the governor has no power to pardon a convicted felon, until he has published his petition, stating the reasons he should be pardoned, for thirty days. See Miss. Const, art. 5, § 124 (1890). Thus, before a governor may pardon a convicted felon, the felon “shall” publish his petition for thirty days before any “pardon shall be granted_”[85] Miss. Const, art. 5, § 124 (1890). Before thirty days expire, the power is only in posse, “ready to come into existence under certain conditions!.]”[86] It is only after thirty-days’ publication that the power is “in actual existence!,]” in esse.[87] A putative pardonee determines when the power comes into actual existence. A pardon granted after the constitutionally enumerated limitations have been satisfied is legally within the breadth of the governor’s authority {in esse) and his reasons for granting are not reviewable. Absent the in esse power, the governor is powerless to grant a pardon and, if issued, its legality is reviewable.
¶ 96. No party has had the temerity to argue that a pardon for treason or impeachment could be granted without Senate approval or that the governor could issue a pardon before a conviction, and that neither unconstitutional act could be judicially reviewed.[88] Yet some convicted felons argue that the third limitation — “no *428 pardon shall be granted ” — does not preclude the governor from issuing pardons (despite that the publication requirement was not met). They further argue that, because judicial review for the legality, vel non, of the pardon is not specified in Section 124, a legal challenge to the pardon is unreviewable by the judiciary. Both arguments are untenable. Just as the governor has no constitutional authority to grant a pardon before a conviction, the governor has no constitutional authority to grant a pardon to a convicted felon until the convicted felon has published for thirty days.[89] No citation is required for the general principle that excising a provision from — and reading nonexistent language precluding judicial review into — Section 124 violates all tenets that govern constitutional interpretation.
¶ 97. The majority relies heavily on a facial-validity analysis.[90] If facial validity is indeed the test, where is the authority and caselaw showing that facial validity constitutes conclusive proof that a pardon is valid, or that it constitutes anything more than a rebuttable presumption of validity? Indeed, the facial validity, vel non, of a pardon should not control our decision, and no authority is cited for this proposition.[91] While “pardons are to be liberally construed in favor of the pardonee,” and there is a presumption in favor of the validity of the pardon[,]” that presumption may be rebutted by proof “that the pardon was illegal.” Gulley, 189 S.W.2d at 390 (citing Horton, 279 S.W. at 1021). Such a rebut-table presumption refutes the majority’s contention that facial validity necessarily mandates nonjusticiability. Taking the majority’s position to its logical extreme, would this Court deem a facially valid pardon procured by fraud irrebuttable and nonjusticiable?[92]
*429 ¶ 98. Furthermore, applying the majority’s facial-validity approach to an attempted land transaction highlights the inherent weakness of that approach.[93] The governor could execute a facially valid deed transferring Blaekacre, but if the government does not own Blaekacre, the facially valid deed is meaningless, a nullity, and void ab initio, for the governor could not convey property not owned by the government. Is the deed enforceable because it is facially valid? A governor could circumvent any limitation of Section 124 by using artful language on the face of a pardon. For example, a governor could issue a pardon reading: “I, Governor X, hereby pardon John Doe of [the specified crime].” There is nothing on the face that exhibits invalidity. But what if the pardon was issued prior to John Doe’s conviction? In order to test the validity of the pardon, a court would necessarily have to look beyond its face.[94] Would we not enforce the condition precedent that “no pardon shall be granted before conviction”? If so, why should the condition precedent that “no pardon shall be granted until the applicant therefore shall have published” receive special dispensation?
¶ 99. This Court has unequivocally declared, and the majority agrees, that publication is required by Section 124. See Grantham, 100 So. 678; (Maj. Op. at ¶¶ 4, 49). In Grantham, a newspaper published a pardon petition for Jeff Lacy, which claimed as grounds for the pardon that Lacy had been convicted entirely upon on Grantham’s unreliable, untrustworthy testimony, and Grantham sued the newspaper for libel.[95] Id. The Court considered the parties’ agreement “that said Jeff Lacy had a right to have a petition for pardon prepared and published in the furtherance of his application for a pardon, and ... that, without publication of the petition for pardon, no pardon could be granted to him.” Plaintiffs Replication to Defendants’ Second Plea (on file at Mississippi Department of Archives and History). In ruling upon the issues presented, this Court found that “Section 124 ... requires all petitions for the pardon of a felon to be published” and that “it is required by law to be published before the pardon therein prayed for can be granted....” Grant-ham, 100 So. at 673-74. The Court’s ruling in Grantham should control our decision today.
¶ 100. Hooker, et al, and the amicus argue that publication is not required. Indeed, only the former Governor and some convicted felons whose putative pardons are at risk have argued that publication is not necessary, and that the governor has the unprecedented authority, heretofore reserved for the judiciary, to interpret the Constitution.[96] Our body of law refutes *430 their contention, as, indeed, for more than eighty years, no one has questioned that the publication requirement must be met before a convicted felon may be pardoned. The doctrine of stare decisis dictates this result.
¶ 101. Additionally, although historical acceptance of this truth by custom and practice — and recognition, acceptance, and support of the same truth by every source we can identify — is not binding, it certainly is instructive. One year before Grantham, in Cleveland, a case relied upon by the putative pardonees, a pardon was issued by the lieutenant governor. Cleveland, 98 So. at 111. It was challenged on the ground that the lieutenant governor did not have the constitutional authority to grant pardons and, thus, the legality of the pardon was at issue. Id. Had the petition not been properly published, the governor challenging the pardon granted by the lieutenant governor assuredly would have raised such invalidity to defeat the pardon. Instead, the parties agreed and stipulated that the convicted felon had properly published his pardon petition, and further that the petition “with publication properly proved was on file in the office of the Governor of the State of Mississippi.”[97] Id. In stipulating that proper publication occurred, the parties communicated their understanding that publication was required, for a stipulation serves no purpose other than that the fact stipulated to is relevant to the resolution of the case. The Court relied upon the stipulation and, by noting it in its opinion, implicitly found publication necessary — the view it stated explicitly the following year in Grantham. See Grantham, 100 So. at 674. Not only did the lieutenant governor and the governor in Cleveland recognize that proper publication was essential, but other governors also have recognized and acted upon the publication requirement, as addressed in Chief Justice Waller’s dissenting opinion. Thus, both the judicial and executive branches, as well as pardonees, historically have recognized that Section 124’s limitation must first be complied with before the governor has the authority to pardon. This is consistent with the position of disinterested legal scholars, who have written that “[bjefore the governor may pardon a person convicted of a felony, the applicant must have published a petition for pardon for 30 days, ‘setting forth the reasons why such pardon should be granted.’ ” Jackson & Miller, 3 Encyclopedia of Mississippi Law § 19:123, at 168-69.[98]
¶ 102. Furthermore, the publication requirement is still recognized by the executive branch, save for the former chief executive. The Mississippi Department of Corrections (MDOC), which is part of the executive branch, advised the governor’s office that publication was required. See Delta Corr. Facility Auth., 871 So.2d at 712 (“Clearly the MDOC is a department of the executive branch.”). The State Parole Board, whose members are appointed by and serve “at the will and pleasure” of the governor, advised Aaron Brown’s wife, Etinika Brown, that publication was required. Miss.Code Ann. § 47-7-5(1) (Rev. 2011).
*431 ¶ 103. Finally, other parties to this proceeding have recognized and complied with the publication requirement. In his habe-as corpus petition, Azikiwe Kambule pleaded that “[p]ursuant to Section 124, no person convicted of a felony may be pardoned by the Governor unless, as a condition precedent, the applicant’s petition for pardon is published by a newspaper for thirty days prior to issuance of the pardon[,]” and pleaded that he had “followed all constitutional guidelines including correctly publishing in the county where he was convicted for a period of thirty days.” Joshua Howard filed a special appearance in circuit court, likewise pleading that he had “followed all constitutional guidelines including correctly publishing in the county where he was convicted for a period of thirty days.”
¶ 104. The four mansion trusties appearing, in their brief, correctly recognize that the text of the Constitution dictates the result.[99] Nonetheless, they argue that the publication requirement applies only when a convicted felon is an “applicant” for a pardon, and “there is no need for an application and no need for publication.” [100] But the contention that some did not apply for a pardon and, therefore, were not required to publish notice, defies the constitutional requirement that a petition be made, and publication had. Absent either, no pardoning power exists. Such contention not only defies the Constitution, but also logic, reason, and common sense. “[T]o exempt the Governor from the ... clause would allow the Governor to circumvent the ... safeguards for which the clause was adopted, rendering the clause meaningless.” Maurer, 644 N.E.2d at 374. Under the putative pardonees’ argument, if the governor wished to grant a pardon to a convicted felon who applied, but failed to meet the publication requirement, then he could simply grant the pardon, argue that the applicant had not applied, and circumvent the Constitution entirely. Even if we were to accept such a dubious proposal, the position must fail, based on this Court’s long-established precedent. In Grantham — the only other time this Court has construed the publication requirement — we found that publication was required, but that the convicted felon for whom a pardon was sought did not have to be the one to file and sign the pardon petition. Grantham, 100 So. at 674. The pardon petition for Jeff Lacy, which gave rise to the libel claim in Grantham, was submitted by “undersigned citizens of Harrison County, Mississippi!,]” and did not include Lacy. Petition for Pardon of Jeff Lacy (on file at Mississippi Department of Archives and History). This Court considered argument that “[njeither the constitution nor statute requires the convict to sign his petition for pardon. He is not free to act for himself and in many cases it is only through others that he can act in the preparation and publication of his petition.” Brief for Appellees, at 11 (on file at *432 Mississippi Department of Archives and History). The Grantham Court concluded that Section 124 “does not expressly require a petition for a pardon to be signed by the person for whom the pardon is requested, nor is such a requirement necessarily implied by the use of the words ‘his petition,’ for when signed and presented for the petitioner by others it becomes as much his petition as if he had signed and presented it himself” Grantham, 100 So. at 674 (emphasis added). Thus, Section 124 does not impose the publication requirement only when a convicted felon is an “applicant,” but in all instances.
¶ 105. In the absence of constitutional power to grant the pardons, the governor’s extra-vires acts are ineffectual and void. See Chevron, 578 So.2d at 648 (the Constitution is “the highest known law” and “[n]o act prohibited by it can be given ef-fectuality and validity.”) (citation omitted); State ex rel. Attorney General v. Irby, 190 Ark. 786, 81 S.W.2d 419, 420 (1935) (“inherently the Chief Executive has no power or authority to grant pardons except that expressly granted by constitutional mandate”) (citations omitted); Horton v. Gillespie, 170 Ark. 107, 279 S.W. 1020, 1024 (1926) (“any pardon which does not substantially comply with the requirements ... must be held to be void.”); Jamison, 228 P. at 99 (“any pardon issued by [the Governor] when the restrictions and regulations provided by law have not been complied with is issued without authority, and is void”); 59 Am. Jur. 2d Pardon and Parole § 34 (2002) (“a pardon ... issued by the governor without compliance with the regulations and restrictions prescribed by law is void.”).
III. All of the cases cited by the majority are distinguishable.
¶ 106. The majority opines that, while publication is required, it is merely “procedural in nature” and that “even assuming the attorney general’s views are correct, ... [t]he controlling issue is whether the judicial branch of government has constitutional authority to void a facially-valid pardon issued by the coequal executive branch, where the only challenge is compliance with Section 124’s publication requirement.” (Maj. Op. at ¶¶ 4, 7, 27). In the absence of publication, the governor has no power to pardon. Before publication, the power to pardon a convicted felon is not vested and does not “properly be-lon[g]” to the governor. Miss. Const, art. 1, § 2 (1890).
¶ 107. Each case relied upon by the majority is distinguishable because it involves demonstrably different facts and, with the exception of Cleveland, 98 So. at 111, and Pope v. Wiggins, 220 Miss. 1, 69 So. 913 (1954), is wholly unrelated to Section 124. Several support justiciability. I shall address each case as presented by the majority. Marbury v. Madison, 1 Cranch 137, 5 U.S. 137, 2 L.Ed. 60 (1803).
¶ 108. The plea for a mandamus writ easily distinguishes the Marbury holding from the case sub judice. In Marbury, a writ of mandamus was sought, requesting the United States Supreme Court to compel President Thomas Jefferson’s Secretary of State, James Madison, to deliver judicial commissions. That remedy has been consistently denied in this state, as this Court has “repeatedly ... prohibited issuance of a writ of mandamus against the Governor.” Barbour, 974 So.2d at 238. See also Fordice v. Thomas, 649 So.2d 835, 840 (Miss.1995); McPhail, 180 So. at 391-92; Wood, 142 So. at 749; Broom, 100 So. at 603; Vicksburg and Meridian R.R. Co. v. Lowry, 61 Miss. 102, 105, 1883 WL 3961 (1883). But “[t]hat is not to say ... that the acts of the Governor and Secretary of State are beyond review of the courts. Once an act is performed, it is then subject *433 to judicial review....” Berger, Order— Case # 2008-M-01534-SCT, at 5 (Sept. 18, 2008).
¶ 109. The present action does not seek to prevent the governor from “attend[ing] to [his] constitutional duties,” which are to be “free of interference by way of mandamus, injunction, or instruction.” Id. at 9. Rather, this action contests whether his actions were beyond his constitutional authority, ie., whether the putative pardo-nees satisfied the publication requirement before the governor issued their pardons. Thus, though the governor’s authority has been placed at issue, it is the putative pardonees’ failure to act that determines whether the governor was vested with the authority to issue the pardons. Both the attorney general and the putative pardo-nees have erred in blaming the governor for this failure. The putative pardonees need to “put the axe at the root of the tree,” for the obligation is imposed upon them, or persons acting on their behalf. Since “no governor, or for that matter, any governmental official, can exercise power beyond their constitutional authority!,]” such review is permissible. Barbour, 974 So.2d at 239 (citations omitted). See also Berger, Order — Case # 2008-M-01534-SCT, at 9 (“once the Governor and Secretary of State act, their decisions and actions are then subject to judicial review.”); Broom, 100 So. at 603 (we may not command the governor to act, “yet, when he has acted ... the legality of the act is a judicial question for the courts.”) (citations omitted) (emphasis added). By disregarding the publication requirement of Section 124, this Court becomes an accomplice in the abridgement of the people’s right to petition their government. While we are constitutionally restricted from enjoining or mandating the governor to grant or deny a pardon, we can review and nullify acts which exceed his constitutional authority. See State ex rel. City of Kansas City v. Renick, 157 Mo. 292, 57 S.W. 713, 714-15 (1900) (addressing “the validity of the alleged executive pardon” because “[w]hen the judiciary is required to pass judgment on the validity of an act of a coordinate branch of the government challenged as being in conflict with the constitution, it exercises the very highest duty intrusted to it, and the most important.”).
¶ 110. Regarding judicial review, Mar-bury provided that “[t]he province of the court is ... not to enquire how the executive, or executive officers, perform duties in which they have a discretion. Questions ... which are, by the constitution and laws, submitted to the executive, can never be made by the court.” Marbury, 5 U.S. at 170 (emphasis added). Yet without constitutional authority to issue a pardon until after publication, the matter was not constitutionally “submitted to the executive,” such that the governor had no discretion to exercise. Id. The absence of constitutional authority to pardon supports justiciability. Nixon v. U.S., 506 U.S. 224, 113 S.Ct. 732, 122 L.Ed.2d 1 (1993).
¶ 111. In Nixon, following hearings before a committee of United States Senators, pursuant to Senate Rule XI, and a subsequent vote before the full Senate, a former district-court judge was impeached. See id. at 226-28, 113 S.Ct. 732. The judge filed suit, maintaining that Senate Rule XI violated Article I, Section 3, Clause 6 of the United States Constitution, which provides that “[t]he Senate shall have the sole power to try all Impeachments.” Id. at 226, 113 S.Ct. 732 (quoting U.S. Const, art. I, § 3, cl. 6). According to the judge, he was constitutionally entitled to a hearing before the full Senate, not merely a committee of Senators. See Nixon, 506 U.S. at 229, 113 S.Ct. 732. The Court disagreed and concluded that the matter was nonjusticiable. See id. at 226, 237-38,113 S.Ct. 732.
*434 ¶ 112. The plain language of the constitutional provision in Nixon is distinguishable from the plain language of Section 124. Article I, Section 8, Clause 6 provides the Senate with the power to try impeachments without limitation, exception, or specific requirements for its exercise by the Senate. See U.S. Const, art. I, § 3, cl. 6. That is patently different from Section 124.
¶ 113. Based upon the plain language of Article I, Section 3, Clause 6, the Nixon Court refused to exercise jurisdiction because the matter of how the Senate exercised its “power to try all Impeachments” involved a “textually demonstrable constitutional commitment of the issue to a coordinate political department....” Nixon, 506 U.S. at 228, 113 S.Ct. 732. But no such “textually demonstrable constitutional commitment” is present here, because the governor’s power to pardon does not exist until thirty days after publication. Id. Before thirty days, the pardoning power is committed to no one, thus, it has not been “committed solely to another branch.... ” (Maj. Op. at ¶ 27). Additionally, the majority surely would not contend that the Mississippi Constitution provides a “textually demonstrable ... commitment” of constitutional interpretation to the governor. Id.
¶ 114. Further distinguishing the Nixon pronouncement, we held in Tuck v. Blackmon, 798 So.2d 402 (Miss.2001), that “this Court ... has authority to declare Senate rules unconstitutional,” when “those rules are ‘manifestly ’ beyond the Senate’s constitutional authority.” Id. at 406-07 (quoting Dye v. State ex rel. Hale, 507 So.2d 332, 345-46 (Miss.1987)) (emphasis added). Ex Parte W.V. Wren, 63 Miss. 512, 1886 WL 3462 (1886).
¶ 115. In Wren, a traveling salesman (Wren) was arrested by the county sheriff after he refused to pay a privilege tax mandated in the subject statute. See id. at *1. Wren filed a writ of habeas corpus which alleged that the subject statute “is not a law” because “the bill signed by the governor was not passed by both houses....” Id. at **1, 13. This Court found the matter to be “political and not judicial ....” Id. at *19.
¶ 116. Wren requested that this Court assume the role of fact-finder, by investigating the legislative journals. This Court expressed its concerns about the prudence of attempting to analyze the collective mind of our legislators, and then being required to investigate their actions, because of:
the spectacle of examination of journals by justices of the peace and statutes declared to be not law as the result of their journalistic history, and the circuit and chancery courts ... constantly engaged in like manner, and this court ..., on appeal, hav[ing] often to try the correctness of the determination of the court below as to the conclusion to be drawn from the legislative journals on the inquiry as to the validity of statutes thus tested.
Id. at *16. But today’s case requires no such investigation. We can simply look at the text of Section 124 and apply it to the undisputed fact presented to us that there was no publication as required by Section 124 for some of the putative pardonees.
¶ 117. Wren also cannot be read without examining other holdings contained therein. It provided that this Court “would not shrink from the investigation of all questions of fact on the existence of which any statute depends....” Id. Applying that principle to “questions of fact” upon the existence of which the Constitution depends, in the present case, there is no proof that some convicted felons met the publication requirement, a limitation *435 upon which the governor’s pardoning power depends under Section 124. Id.
¶ 118. Finally, Wren’s holding was predicated upon the matters being “confided exclusively to [the Legislature] by the constitutionf,]” over which their “power to act is undoubted.” Id. at **14, 17. According to Wren, it would be “fundamental error” for “the judicial department to revise and supervise the legislative as to the manner of its performance of its appointed constitutional functions [,]” that the Legislature is “not subject to supervision and control during its performance of its constitutional functions [,]” and that “the courts have nothing to do in the way of revision of how the legislature has performed its duty in the matters confided exclusively to it by the constitution.” Id. at *17 (emphasis added). The present case is distinguishable because the governor’s “power to act” without publication is more than doubtful — it is nonexistent. Id. at *14. Thus, in the absence of publication, the governor has no “appointed constitutional functio[n]” to exercise, i.e., no power to pardon. Id. at *17. By virtue of that constitutional infirmity, this Court “should not shrink from declaring [his] act ... void....” Id. at *18. State v. McPhail, 182 Miss. 360, 180 So. 387 (1938).
¶ 119. In McPhail, the governor issued an executive order sending the Mississippi National Guard into East Jackson, a notorious area in Rankin County known as the “Gold Coast,” to assist in enforcing criminal laws.[101] See id. at 388-89. After a search warrant executed by an officer of the National Guard at McPhail’s place of business resulted in the seizure of intoxicating liquors, the State sought to abate the establishment as a common nuisance. See id. at 389. The chancellor “ruled that the facts were not sufficient to authorize the interference of the militia[,]” excluded the evidence, and dismissed the bill. Id. On appeal, this Court reversed and remanded. See id. at 392. Notably, this Court did not find the matter nonjusticia-ble, but instead reviewed whether the power exercised by the governor on behalf of the general public[102] was constitutionally sound, and concluded that “under the state of facts here presented the Governor was within his constitutional and statutory power....”[103] Id.
¶ 120. As to the “constitutional and statutory provisions” addressing the governor’s oversight on execution of the laws, the McPhail Court determined that their plain language required:
not that there shall be an arbitrary enforcement by the executive of what he may consider the law to be, but the enforcement of judicial process that is, the enforcement of a right or remedy provided by the law and judicially determined and ordered to be enforced.... [Such] provisions ... mean that whatever the Governor does in the execution of the laws ... must be as [a] civil officefr], and in strict subordination to the general law of the land.
Id. at 389-90 (emphasis added). Similar to those provisions, the publication requirement in Section 124 has “no obscure or technical meaning; neither *436 [was it] intended as a mere verbal adornment....” Id. at 389. It means “what is in the ordinary import of the language used.... ” Id. And the “ordinary import” of its language is that no power to pardon exists until after publication. Id. Even the governor of Mississippi must act “in strict subordination” to this “general law of the land.” Id. at 390.
¶ 121. Regarding judicial review, McPhail held that:
[ojfficial action, whether the officer be of the highest or the lowest grade, must be within the Constitution and the laws, and the facts must be such as to uphold or justify the exercise of the official authority which in a given case is exerted. If any officer, be he high or low, attempt to exercise an authority not legally vested in him, or if he attempt to do so upon a state of facts which does not bring the asserted authority into existence, his action thence is as much the subject of judicial review and remedial rectification as is the action of any private person within the jurisdiction of the state.
[[Image here]]
[W]henever ... any ... officer acting or assuming to act for the government, puts into action any agency which comes into collision with the private personal or private property rights of any person within the jurisdiction of the state, such personal and property rights of the citizen and their infringements are always subject to inquiry and redress by the courts, as against any unauthorized act by any officer of the state, whatever his character and rank may be, and all appropriate judicial process will be directed to and against his agents or agencies — and against the officer himself ...; and the courts will determine for themselves not only the law, but ultimately also whether there be justifying facts, however much may be the weight, prima facie, which the judicial department will yield to the findings of fact by an executive or administrative officer as those upon which he has acted.
Id. at 391-92 (emphasis added). In the present case, absent publication, the governor is either “attempting] to exercise an authority not legally vested in him” or operating under “a state of facts which does not bring the asserted authority into existence....” Id. at 391. By disregarding the publication requirement, the governor is acting beyond the scope of his constitutional authority and, by subterfuge, is “unlawfully] violating],” voiding, annulling, and abridging the right to petition the government granted to all citizens.[104] Id. at 392; Miss. Const, art. 3, §§ 11, 32 (1890). As noted in paragraph 110 supra, the present action does not involve an impermissible “mandamus, prohibition, or injunction directing] or restraining] [the governor] in the exercise of his power.” McPhail, 180 So. at 392 (emphasis added). As such, under McPhail, the governor’s unauthorized action is a “subject of judicial review and remedial rectification^]” because “[u]nder our form of government there is no arbitrary power, that is to say, no power above the law; but every unlawful power is the subject of scrutiny by the courts, [w]here it operates to the legal hurt of any citizen, however humble.” Id at *437 391-92. Montgomery v. Cleveland, 134 Miss. 132, 98 So. 111 (1923).
¶ 122. In Cleveland, Cleveland filed a writ of habeas corpus against various trustees (collectively, Montgomery) seeking discharge from the state penitentiary based upon a pardon issued by the lieutenant governor. See id. at 111. Significantly, publication was not at issue because an agreed statement of facts provided that the requirement had been satisfied. See id. This Court did not find that a facially valid pardon commanded Cleveland’s release, but rather considered facts, regarding the legality of the pardon, i.e., whether the governor was in the state, before the Court deemed it valid. See id.
¶ 123. This Court stated that the governor “is the sole judge of the sufficiency of the facts and of the propriety of granting the pardon, and no other department of the government has any control over his acts or discretion in such matters.... [N]o authority other than his judgment and conscience can determine whether it is proper to grant or refuse the pardon....” Id. at 114 (emphasis added). In the absence of publication, however, the governor has no constitutional authority to “ac[t,]” or “discretion” to exercise, in granting a pardon to a convicted felon. Id. Only after publication for thirty days is the governor free to consider (or not consider) any “facts” regarding the pardon (i.e., the crime of conviction, post-conviction behavior, the possibility of actual innocence and/or the gross miscarriage of justice,[105] public comment, pro and con, etc.) in deciding “the propriety of granting the pardon. ...” Id. Pope v. Wiggins, 220 Miss. 1, 69 So.2d 913 (1954).
¶ 124. In Pope, Pope filed a writ of habeas corpus against the superintendent of the Mississippi State Penitentiary (Wiggins) after Pope’s suspended sentence was revoked by the governor without notice or hearing.[106] See id. at 913-14. In discussing Section 124, this Court did not address the publication “portion,” as it was not “pertinent” to the holding. Id. at 915. Regarding Section 124, this Court stated that the power to pardon “is not limited by any other provision.... ” Id. (emphasis added). I would agree with Pope that no other constitutional provision limits the power to pardon, for indeed the limitations are expressly set forth in Section 124. Hunt v. Wright, 70 Miss. 298, 11 So. 608 (1892).
¶ 125. In Hunt, a mandamus action was filed that sought to compel the tax collector and sheriff (Wright) to issue Hunt a license to sell liquors by the gallon.[107] See *438 id. at 609. Hunt claimed that the subject statutes regarding “dramshops” and “privilege taxes” were “ineffectual” for various reasons, including, inter alia, that they were “passed within the last five days of the session....” Id. Relying upon Wren, this Court found that it “is not an overseer of the legislature during its labors” and that the “enactment has all the forms and requirements of law as prescribed by the constitution....” Id. at 609-10.
¶ 126. Because of Hunt’s reliance upon Wren, the prior analysis regarding Wren is applicable. See supra ¶¶ 117-19. For instance, the Hunt Court stated that for constitutional “rules of procedure prescribed for the legislature, ... the houses are intended as a mutual check, and the governor on both.... ” Id. at 610. Because a bill requires approval by both houses and the governor to become law, these checks existed. By contrast, without judicial review, no check exists for the unauthorized exercise of a power not conferred by the Constitution.
¶ 127. Furthermore, unlike Hunt and Wren, the present case does not require this Court to engage in the equivalent of “scrutinizfing] the daily doings of the legislature.” Id. We need only apply the text of Section 124 to the conceded facts that some putative pardonees failed to meet the thirty-day publication requirement.
¶ 128. Finally, while Tuck cited Hunt and Wren for the proposition that “procedural provisions for the operation of the Legislature ... should be left to the Legislature to apply and interpret, without judicial review[,]” it further stated that “this Court ... has the authority to declare Senate rules unconstitutional,” when “those rules are ‘manifestly5 beyond the Senate’s constitutional authority.” Tuck, 798 So.2d at 406-07 (quoting Dye, 507 So.2d at 345-46). Lang v. Board of Supervisors, 114 Miss. 341, 75 So. 126 (1917).
¶ 129. In Lang, a landowner (Lang) filed suit seeking to enjoin the board of supervisors from issuing road bonds, pursuant to the subject statutes, in districts where his property was located. See id. at 126-28. Lang claimed that “the act is unconstitutional because of an insufficient title.” Id. at 128. This Court determined “that the sufficiency of the title is a question solely for the Legislature.” Id. But this Court added that “an act without a title would not be a law....” Id. (quoting City of Jackson v. State, 102 Miss. 663, 684, 59 So. 873, 874 (1912)). A pardon granted to a convicted felon before publication is equivalent to “an act without a title.... ” Id. In the present case, the State does not contest that sufficiency of the reason for a pardon is nonjusticiable. In re Moore, 4 Wyo. 98, 31 P. 980 (1893).
¶ 130. The Wyoming Constitution provided that:
[t]he governor shall have power to remit fines and forfeitures, to grant reprieves, commutations, and pardons after conviction, for all offenses except treason and cases of impeachment; but the legislature may by law regulate the manner in which the remissions of fines, pardons, commutations and reprieves may be applied for.
Id. at 981 (quoting Wyo. Const, art. 4, § 5). In Moore, the Wyoming Supreme Court addressed the impact of “[t]he nonobservance of certain statutory provisions as to giving and publishing notice of the application for a pardon....” In re Moore, 31 P. at 981 (emphasis added). That, court concluded that such statutes regulated only “the method of procedure by petitioners to bring their applications before the governor in a manner to entitle them to be heard,” and did not limit “the authority or discretion of the Governor, when he saw fit to exercise it on different grounds.” Id. As this subject *439 went beyond “the jurisdiction of the governor[,]” the court deemed it nonjusticia-ble. Id. at 982.
¶ 181. The textual differences between the Wyoming Constitution and the Mississippi Constitution distinguish In re Moore. The Wyoming Constitution stated only that the Legislature could regulate the “manner” of application for pardons. Id. at 981 (quoting Wyo. Const, art. 4, § 5). It made no reference to the governor’s power to pardon being limited by the absence of a statutorily mandated application. By contrast, the Mississippi Constitution expressly provides that no pardon to a convicted felon “shall be granted” until the publication requirement is satisfied. Miss. Const, art. 5, § 124 (1890). In Mississippi, the governor has been granted no power to pardon a convicted felon before publication.
IV. Conclusion
¶ 132. The legal morass and uncertainties created by this proceeding could have been avoided by simply following the express language in the Constitution. Section 124 plainly requires that publication for thirty days be met before the governor is constitutionally empowered to pardon a convicted felon. As Presiding Justice Dickinson previously has opined, “I cannot overlook ... my constitutional duty to apply the law as it is written. I simply do not believe I have the right to apply some laws, and ignore others.... ” Lee, 999 So.2d at 1271 (Dickinson, J., dissenting). I would remand this case to the Circuit Court of Hinds County for proceedings consistent with this opinion. The question for the circuit court would be whether the putative pardonees complied with the Constitution, for, as the majority finds, the convicted felons have an obligation to apply and publish thirty days before a pardon may be granted. (Maj. Op. at ¶ 4, 49). The pardons are presumed valid, but their validity “may be controverted by the [State]-” Wilson, 32 U.S. at 161. The circuit court would determine whether the State has overcome the presumption of validity. For any putative pardonees that have satisfied the application and publication requirements, their pardons should be honored, and the reasons for granting the pardons are not subject to review by any court. On behalf of the people, the Constitution, our body of law, and for the reasons stated herein, I respectfully dissent.
WALLER, C.J., AND PIERCE, J., JOIN THIS OPINION.

.Lest we in government forget, let it be declared again: "All political power is vested in, and derived from, the people; all government of right originates with the people, and is founded upon their will only, and is instituted solely for the good of the whole[,]” and "[t]he enumeration of rights in this constitution shall not be construed to deny and impair others retained by, and inherent in, the people." Miss. Const, art. 3, §§ 5, 32 (1890); see The Declaration of Independence ¶ 2 (U.S. 1776) (describing the people’s "separate and equal station to which the Laws of Nature and of Nature's God entitle them” and providing that "Governments are instituted among Men, deriving their just powers from the consent of the governed.... ”).

. See Miss. Const, art. 3, §§ 11, 32; art. 5, § 124(1890).

. Grantham v. Wilkes, 135 Miss. 777, 100 So. 673, 674 (1924).

. See Pope v. Wiggins, 220 Miss. 1, 69 So.2d 913 (1954); Montgomery v. Cleveland, 134 Miss. 132, 98 So. 111 (1923).

. For example, see People ex rel. Garrison v. Lamm, 622 P.2d 87 (Colo.Ct.App. 1980), *422 which has factual similarities to Marbury v. Madison, 1 Cranch 137, 5 U.S. 137, 2 L.Ed. 60 (1803), and legal similarities to Cleveland. In the absence of the governor, the lieutenant governor signed a pardon (see Cleveland, 98 So. at 114). Garrison, 622 P.2d 87. The governor, upon return to his office, refused to deliver the signed document (see Marbuiy, 5 U.S. at 177), and the putative pardonee demanded delivery to effect his pardon. Gani-son, 622 P.2d at 87. The governor argued that the conditions precedent to obtaining a pardon had not been met, and, therefore, that it was void. Id. The Colorado court considered the arguments (pro and con) but did not declare it nonreviewable. Rather, it considered the applicable constitutional provisions (as should be done in this case, for this is what courts do). Id. The court determined that, under the existing law, the condition precedent to issuing the pardon had not occurred (as, for some, in today’s case), and declared the pardon void. Id. See also State ex rel. Maurer v. Sheward, 71 Ohio St.3d 513, 518, 644 N.E.2d 369, 373 (1994) (Ohio court found that "a purported pardon is not really a pardon at all if constitutionally authorized procedural limitations on the pardoning power are ignored” and "[a]n attempted pardon that is granted without adherence to constitutionally authorized requirements is invalid and is not immune to challenge.”); Gulley v. Budd, 209 Ark. 23, 29 189 S.W.2d 385, 388 (1945) ("We are without power to review the Governor’s discretion in issuing this pardon” but "we may consider ... the Governor’s power to act.”); Jamison v. Flanner, 116 Kan. 624, 228 P. 82, 99 (1924) (Kansas court found that ”[t]he Governor, ... simply by virtue of his office as such, takes no power touching pardons.... He derives his power from the Constitution and laws alone[,]” and "the loose notion which sometimes prevails that the pardoning power is an executive power, to be exercised by the Governor in his discretion, and that no other official or department of the government can interfere with it ... is so only when made so by the Constitution.”) (citation omitted).

.See 59 Am. Jur. 2d Pardon and Parole § 23 (2002) ("The person or body in whom the [pardoning] power is vested has only the authority confeired by the constitutional provision, and such power may be exercised only in the cases and in the manner prescribed”) (emphasis added); CJ.S. Pardon and Parole § 10 (2002) ("The pardoning power of a governor ... is subject to restrictions contained in the constitutional provision granting the power”); Judicial Investigation of Pardon by Governor, 65 A.L.R. Pardon 1471 (1930) ("All of the cases agree that judicial authority extends to the determination of whether, in a given case, the pardoning power has been validly exercised.”) (emphasis added).

. See Jeffrey Jackson & Mary Miller, 3 Encyclopedia of Mississippi Law § 19:123, 168-69 (2001) ("[bjefore the governor may pardon a person convicted of a felony, the applicant must have published a petition for pardon for 30 days, 'setting forth the reasons why such pardon should be granted.' ”); George H. Ethridge, Mississippi Constitutions (1928) (the governor's "power to grant pardons is full and complete when the conditions imposed by the Constitution are complied with.") (emphasis added). Ethridge served on this Court from 1916 until 1941, during which time several cases cited by the majority and dissents were decided.

. Notably, the United States Supreme Court has reviewed whether pardons granted by the President of the United States were within the authority conferred by the federal constitution, even though the President’s pardoning power is limited only by an inability to pardon in cases of impeachment. See U.S. Const, art. 2, § 2; Schick v. Reed, 419 U.S. 256, 264, 95 S.Ct. 379, 42 L.Ed.2d 430 (1974) (finding that "the conclusion is inescapable that the pardoning power was intended to include the power to commute sentences on conditions which do not in themselves offend the Constitution, but which are not specifically provided for by statute.”); Biddle v. Perovich, 274 U.S. 480, 487, 47 S.Ct. 664, 71 L.Ed. 1161 (1927) (addressing whether a commuted sentence "was authorized by law ... within the scope of the words of the Constitution, article 2, s 2”); U.S. v. Wilson, 7 *423 Pet. 150, 32 U.S. 150, 161, 8 L.Ed. 640 (1833) (a pardon "may be controverted by the prosecutor, and must be expounded by the court”). If the broad pardoning power of the federal constitution has been subjected to judicial review by the highest court in the land, cannot the more limited pardoning power of the Mississippi Constitution fairly be subject to judicial review as well?

. That Section 124 does not confer an absolute pardoning power on the Mississippi governor plainly can be seen. The governor has: (1) no power to grant a reprieve for treason or remit a forfeiture, without consent of the Senate; (2) no power to grant a pardon before conviction; and (3) no power to pardon a convicted felon until thirty-days’ publication has occurred. Miss. Const, art. 5, § 124.
In contrast, an example of absolute pardoning power is found in the North Dakota Constitution, which provides that ”[t]he governor may grant reprieves, commutations, and pardons. The governor may delegate this power in a manner provided by law.” N.D. Const, art. 5, § 7.

. Any time a court has the power, authority, duty, or responsibility to do something, the issue is justiciable. The term "justiciable” refers to a court’s ability to hear a case. See Bryan A. Garner, A Dictionary of Modem Legal Usage 493 (2d ed. 1995) (defining "justiciable” as "susceptible of judicial decision; triable”).

. Nor has the extent of the governor’s constitutional power been textually committed to the governor, as the majority maintains. The judicial department, not the executive, has the "duty of determining whether ... [the executive] ha[s] exceeded the powers granted to [him] by the Constitution.” Albritton, 178 So. at 803. And the Constitution provides that the governor has no power to pardon a convicted felon "until ... the applicant therefore shall have published for thirty days....” Miss. Const, art. 5, § 124 (1890).

. The beauty of the Constitution is that, if application of its words causes unintended results, the Constitution provides a remedy: amend it. See Miss. Const, art. 3, § 6 (1890) ("The people of this state have the inherent, sole, and exclusive right to ... alter and abolish their constitution ... whenever they deem it necessary to their safety and happiness”). But it is not proper or lawful to disregard or ignore its mandates.

.The publication requirement serves a real purpose: it discourages and impedes furtive, surreptitious actions from remaining undisclosed to the public until after the act is complete, leaving no avenue for the people to petition the government (a right those pesky people reserved unto themselves in Article 5, Section 124 and in Article 3, Section 11). In requiring public notice before empowering the governor to pardon, the people of Mississippi demanded transparency in the process, more than a century before "transparency” became a political buzzword. If a convicted felon, by his efforts or by the efforts of others, hopes to be the beneficiary of the people’s mercy through the governor's act, he shall, by publication, give the public thirty-days’ notice before the governor can decide to extend mercy, vel non, on behalf of the sovereign (the people). This notice serves to foment public discourse and to insure that the governor can be fully informed, by all interested persons, of the pros and cons of granting a pardon. Once thirty-days’ publication has run, then (and only then) the governor has the authority to pardon, and his decision — be it right, wrong, or for no reason at all — is not subject to judicial review.

. See Black’s Law Dictionary 863 (9th ed. 2009) (defining in posse as “[n]ot currently existing, but ready to come into existence under certain conditions in the future; potential.").

. See Black’s Law Dictionary 846 (9th ed. 2009) (defining in esse as "[i]n actual existence; in being.”).

. Would extending the majority’s contention that the power to pardon has been "textually committed to another branch of government” and is "nonjusticiable[,]” mean that even pre-conviction pardons or preconsent of the Senate pardons are nonjusticiable? (Maj. Op. at ¶ 25). If so, today’s holding supports an unacceptable accretion of power and defies our body of law that "no governor ... can exercise power beyond [his] constitutional authority.” Barbour, 974 So.2d at 239. If not, then why are these pardons treated differently?

. The governor's lack of constitutional authority to pardon is subject to judicial review. Barbour v. Berger, Order-Case # 2008-M-01534-SCT, at 9 (Sept. 18, 2008) ("once the Governor and Secretary of State act, their decisions and actions are then subject to judicial review.”); Barbour v. State ex rel. Hood, 974 So.2d 232, 239 (Miss.2008) ("no governor ... can exercise power beyond [his] constitutional authority.”); Broom, 100 So. at 603 (we may not command the governor to act, "yet, when he has acted ... the legality of the act is a judicial question for the courts.”).

. In Cousin v. Enterprise Leasing Co.-South Cent., Inc., 948 So.2d 1287 (Miss.2007), Justice Dickinson’s dissent scoffed at the notion that a facially valid driver’s license was proof of being "then duly licensed.” Id. at 1292 (Dickinson, J., dissenting) (citation omitted). Today we should likewise scoff at the notion that a facially valid pardon is dispositive proof of its substantive legality. The sagacious analysis of Justice Dickinson in Cousin should guide our analysis. "[T]he majority ipso facto considers a person who possesses an invalid driver's license [pardon] that appears valid to be ‘then duly licensed' [pardoned].” Id. at 1293 (Dickinson, J., dissenting). "I fail to follow the majority's logic in finding that a person who does not hold a valid driver’s license [pardon] is nonetheless 'duly licensed' [pardoned] simply because that person presented an invalid license [pardon] that was 'facially valid.' ” Id. "With all due respect to the majority, its decision today injects an exception [standard] into Section 63-1-67(1) [Section 124], and thus represents an amendment to, rather than an interpretation of, the statute [constitutional provision].” Id. at 1294. "We must respect the wording selected by the Legislature [the people], even though we might believe the statute [constitutional provision] to be impractical, unworkable, or unwise.” Id. Section 124 neither states nor implies that the facial validity, vel non, of a pardon is the touchstone for deciding this dispute.

. While the majority relies on Ex Parte W.V. Wren, 63 Miss. 512, 1886 WL 3462 (1886), that is not a pardon or executive-order case; it regarded the validity of bills passed by the Legislature. Wren is further distinguishable, for the reasons provided in ¶¶ 32-35, infra.

. Under the majority’s analysis, could the defrauded governor not contest the pardon, *429 because the issuance of a pardon is an official act on behalf of the people, rather than a personal or private act, such that there would be no "justiciable violation of a personal right”? (Maj. Op. at ¶ 1).

. Such comparison is quite apropos, since Chief Justice Marshall compared delivery of a pardon to delivery of a deed in Wilson. See Wilson, 32 U.S. at 161.

. The same would be true if John Doe was convicted of treason or impeachment, and a pardon was issued without the advice and consent of the Senate.

. After his petition was properly published, the governor issued Lacy a pardon. See Brief for Appellees (on file at Mississippi Department of Archives and History).

. For the mansion-trusty pardons, the Governor did not make a decision as to whether publication was made, but rather adopted the position taken by the putative pardonees, that he has the authority to interpret the Constitution and declare publication unnecessary altogether. In other words, "we are not dealing here with a question of whether information provided in response to the requirement is substantial enough[,]” but whether it is con *430 stitutionally permissible to "provide[ ] nothing at all in response to the ... requirement.” Lee, 999 So.2d at 1269 (Dickinson, J., dissenting).

. Such evidence has not been stipulated or proven by Hooker et al., for the governor says that no files exist for the mansion trusties.

. The putative pardonees cited Jackson, at page 168, in their briefs to support their argument, but omitted the above-quoted sentence, which directly follows, appearing on page 169.

. The brief was filed on behalf of four mansion trusties: Hooker, Gatlin, Kern, and McCray. A fifth trusty, Ozment, has never appeared in these proceedings.

. The majority’s finding that “it fell to the governor, alone, to decide whether the Constitution's publication requirement was met” must fail as to these putative pardonees, for they and the Governor assert it was not required, a rather dubious claim, as they later published, but not within the thirty-day requirement. (Maj. Op. at II 5). The mansion trusties expressly contend that “their pardons are in no way affected by any purported failure to comply with the 30-day notice provision.” In cases where the absence of publication is undisputed, there is no contested fact to "decide.” That is, one cannot "decide” whether or when the thirty-day "publication requirement was met[,]” when it is undisputed by those concerned that the event did not occur.

.McPhail involved “a substantial breakdown in the enforcement of the law” by local authorities in East Jackson. Id. at 389. I would opine that the majority’s tacit approval of pardons granted to convicted felons in the absence of publication, through its nonjustici-ability analysis, is a distinguishable form of "breakdown ... of the law.” Id.

. Not a person, but all persons.

. The Court did not base its decision on whether the governor’s executive order was facially valid.

. Why the majority declares that the absence of publication does not violate any and all citizens' personal right to petition the government, which is guaranteed to every person in our Constitution, remains a mystery. Here, the State stands before this Court on behalf of the people, claiming a right to petition the government for thirty days before the governor's power to pardon is vested; with the governor thereafter having no obligation to heed their advice, one way or the other.

. Neither of these is claimed in this case.

. Pope illustrates why clemency is disfavored by some. Following the governor’s suspension of sentence and release of Pope for a murder committed in Leflore County, Pope was indicted for another murder in Bolivar County. See id. at 914. It also calls into question the purported significance of amicus counsel's assertion at oral argument, referred to in footnote 69 of Justice Chandler’s concurrence, that, according to the governor, “no public comment would have changed his decision to pardon the appellants.” (Chandler Op. at ¶ 74 n. 69). In the absence of sworn testimony or affidavit, I attribute such a dubi-table claim to overzealous advocacy, in light of the revelation that, when putative pardonee Harry Bostick received his pardon, he:
was sitting in an Oxford, Mississippi, jail cell for violating the terms of a previous DUI sentence and was awaiting formal charges from yet another drunken driving accident in October that ended in the tragic death of 18-year-old Charity Smith.
See http://www.cnn.com/2012/02/03/justice/ mississippi-pardon-dui/index.html (last visited Mar. 7, 2012). According to the governor’s spokeswoman, the governor "wasn't aware of the subsequent charges” when reviewing Bos-tick’s case. Id.

.Preliminarily, for the reasons discussed in paragraph 110 supra, a demand for mandamus in Hunt distinguishes that case.